ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| HOT ASPHALT PAVING, INC.<br><br>APELANTE<br><br><br>v.<br><br><br>RT ASPHALT, INC., SUCN. DE RAMÓN TORRES RIVERA COMPUESTA POR ASHLEY NICOLE TORRES TARAFA, STEPAHNIE TORRES TARAFA, RYAN TORRES CRUZ Y RAYMOND LUIS TORRES TARAFA<br><br>APELADOS | KLCE202500209 | *Certiorari* acogido como Apelación procedente del Tribunal de Primera Instancia, Sala Superior de Ponce<br><br>Caso Núm.: PO2020CV00948<br><br>Sobre: Acción reivindicatoria; Daños y perjuicios y remedio al Amparo de la Regla 56 de Procedimiento Civil |

Panel integrado por su presidenta, la Juez Aldebol Mora, la Jueza Boria Vizcarrondo y la Juez Lotti Rodríguez.[1]

Lotti Rodríguez, Juez Ponente

### SENTENCIA

En San Juan, Puerto Rico, a 19 de marzo de 2026.

Comparece ante nos Hot Asphalt Paving, Inc. (en adelante, Hot Asphalt o apelante), mediante el recurso de epígrafe, presentado el 4 de marzo de 2025, y solicita que revisemos la *Sentencia* emitida el 10 de diciembre de 2024 y notificada al día siguiente, por el Tribunal de Primera Instancia, Sala Superior de Ponce (en adelante, TPI o foro primario). Mediante el referido dictamen, el TPI declaró No Ha Lugar la *Demanda* presentada por Hot Asphalt.

---

[1] Conforme la OATA2025-078 la Hon. Glorianne Lotti Rodríguez, sustituye a la Hon. Laura Ortíz Flores.

El 26 de diciembre de 2024, la parte apelante presentó una *Moción de Reconsideración*, la cual fue declarada No Ha Lugar por el TPI el 31 de enero de 2025.

Por los fundamentos que se exponen a continuación, se ***confirma*** la *Sentencia* apelada. Veamos.

**I.**

El 6 de julio de 2020, Hot Asphalt presentó una *Demanda*[2] contra RT Asphalt, Inc. y el señor Ramón Torres Rivera, por sí y en representación de la sociedad legal de gananciales (en adelante, RT Asphalt, señor Torres Rivera y, en conjunto, apelados). En la misma solicitó, entre otros remedios, la reivindicación de diversos equipos y vehículos, así como una indemnización por daños y perjuicios y la concesión de remedios provisionales al amparo de la Regla 56 de Procedimiento Civil.

En esencia, la parte apelante alegó que era titular de múltiples equipos y vehículos adquiridos durante los años 1995 a 2010. Sostuvo que algunos de estos bienes se encontraban inscritos en el Departamento de Transportación y Obras Públicas (DTOP) y que otros no estaban registrados. Señaló que ciertos vehículos y equipos inscritos en el DTOP fueron traspasados temporeramente a nombre del señor Torres Rivera como parte de una decisión de negocio dirigida a proteger los bienes corporativos, con el acuerdo de que posteriormente serían devueltos y reinscritos a nombre de la corporación. Además, la parte apelante adujo que los equipos estaban siendo utilizados por los apelados, obteniendo beneficio económico y sin darles el debido mantenimiento.

Añadió que, a partir del año 2016, el señor Torres Rivera se negó a pagar renta por la utilización de los equipos y a reinscribirlos a nombre de la parte apelante. Asimismo, alegó que señor Torres Rivera se llevó la gran

---

[2] Entrada Núm. 1 del Sistema Unificado de Manejo y Administración de Casos (SUMAC) del TPI.

mayoría de los equipos y desde entonces los ha utilizado sin pagar por su uso. Ante tales alegaciones, la parte apelante solicitó que el foro primario emitiera una orden para la entrega inmediata de los equipos, que condenara a la parte apelada al pago de $3,450,000.00 por los daños sufridos y arrendamientos, más $25,000.00 en honorarios de abogado por temeridad.

Tras varios incidentes procesales, el 13 de enero de 2021, la parte apelada presentó una *Moción sobre Desestimación al amparo de la Regla 10.2 de Procedimiento Civil*[3] en la cual sostuvo que las alegaciones de la demanda no justificaban la concesión de un remedio ya que, según alegó, los equipos en controversia fueron donados al señor Torres Rivera, por parte del señor José Luis Torres Negrón, padre de este y presidente de Hot Asphalt.

El 1 de marzo de 2021, la parte apelante se opuso a la solicitud de desestimación alegando, entre otras cosas, que el acuerdo de traspasar los equipos a nombre del señor Torres Rivera fue "uno disimulado donde con posterioridad a que se resolviera el asunto con el banco, los equipos se traspasarían a nombre del demandante nuevamente" y que, contrario a lo alegado por la parte apelada, existían controversias de hechos esenciales para resolver el caso, que no debían ser despachadas mediante una moción de desestimación al amparo de la Regla 10.2 de Procedimiento Civil.[4]

Atendidos los planteamientos de las partes, el 26 de abril de 2021, el TPI dictó una *Resolución*[5] mediante la cual denegó la solicitud de desestimación presentada por la parte apelada.

Ante ello, el 17 de mayo de 2021, la parte apelada presentó su *Contestación a Demanda*[6], en la cual negó las alegaciones sustantivas de la demanda y sostuvo, entre otras cosas, que hubo una donación de bienes muebles a favor del señor Torres Rivera.

---

[3] Entrada Núm. 46 del SUMAC del TPI.
[4] Entrada Núm. 59 del SUMAC del TPI.
[5] Entrada Núm. 62 del SUMAC del TPI.
[6] Entrada Núm. 65 del SUMAC del TPI.

Durante el trámite del caso se presentaron varias mociones relacionadas con la paralización de equipos y la solicitud de celebración de una vista evidenciaria sobre ese asunto, al amparo de la Regla 56 de Procedimiento Civil.[7] No obstante, las mismas fueron denegadas por el foro primario por entender que existían hechos en controversia que ameritaban la celebración de un juicio en su fondo.[8]

El juicio en su fondo se celebró los días 5, 6 y 7 de agosto de 2024.[9] Durante el mismo se admitió prueba documental y ambas partes presentaron testigos. Concluido el desfile de la prueba, el TPI concedió un término a las partes para la presentación de memorandos de derecho.

Luego de evaluar la prueba desfilada en el juicio y los memorandos de derecho presentados por las partes, el 10 de diciembre de 2024, archivada en autos y notificada el 11 de diciembre de 2024, el TPI dictó *Sentencia*[10] declarando No Ha Lugar la *Demanda* presentada.

En su *Sentencia*, el foro primario consignó las siguientes determinaciones de hechos:

1. La parte demandante Hot Asphalt Paving, Inc. es una corporación activa debidamente autorizada a hacer negocios en Puerto Rico, registrada en el Departamento de Estado de Puerto Rico, con número de registro 67049.

2. La parte demandada está compuesta por RT Asphalt, Inc., corporación activa, registrada en el Departamento de Estado, con número de registro 377875. También se acumula como parte co-demandada al Sr. Ramón Torres Rivera.

3. Durante los años 1995 a 2010 la parte demandante Hot Asphalt Paving Inc., adquirió entre otros los siguientes equipos: Blowknox Paver con número de serie 4J862898, modelo PF3200 del año 1999; Leeboy Paver, con número de serie 2468/104120004518, modelo L8500-T del año 2001; Bomag Vibrator, con número de serie 101580111011, modelo BW177ad-3 del año 2000, Newholland Tractor, con número de serie 705298M modelo 30102WD del año 2004, Duopact Roller con número de serie 148, modelo SDR1500, del año 1998; Dynapac Roller, modelo CC 142 y máquina de Pintar Líneas y tanque de 1,000 galones. **En cuanto a los hechos que provocan esta demanda, estos equipos, en vista de que no están inscritos**

---

[7] Véanse Entradas Núm. 83, 87, 91, 93, 106, 120, 122 del SUMAC del TPI.
[8] Entradas Núm. 109 y 123 del SUMAC del TPI.
[9] Véanse Minutas en las Entradas Núm. 133, 131 y 132 del SUMAC del TPI.
[10] Entrada Núm. 143 del SUMAC del TPI.

**en el Departamento de Transportación y Obras Públicas no se hizo ningún negocio y los mismos permanecerían en posesión, control y propiedad de la parte demandante.**

4. Que la demandante también era titular de los vehículos marca Benson, modelo Tumba, del año 2001, tablilla 78662A, Número de Registro 6290375; Benson, modelo Tumba, del año 2001, tablilla 78661A, Número de Registro 6283845; Marca Kenworth Modelo T800, del año 2000, color rojo, con tablilla 33603R, Número de Registro 7142785; Marca Dodge, Modelo RAM1500, del año 2009, Tablilla 854678, Número de Registro 7168358; Ford Conventional HL8501 del año 1998, Tabilla H41291, Número de Registro 6310248; Ford F150, color verde, del año 1999, Tablilla 633986, Registro Número 5536327; Kenworth T800, color rojo, del año 2000, Tabilla 33607R, Registro Número 7166805; Marca Dodge, Modelo RAM1500, del año 2005, color gris, , Tablilla 721504, Registro Número 6518165; Camión MACK, Modelo TK, del año 1982, Tablilla RP11203, Número de Registro 6159168; Marca Dodge, Modelo RAM1500, del año 2011, color rojo, Tablilla 888105, Número de Registro 10120313; Tumba Summit TRLR, color gris, del año 2000, Tablilla 104072A, Registro Número 5721631; Mercedes Benz S500, color gris, del año 2000, Tablilla DNY-227, Registro Número 5570532; Camión Western, Modelo STA Truck BCO, del año 2001, Tablilla H26753, Número de Registro 6298959, este camión tiene un tanque de 1,000 galones instalado que también pertenece a la parte demandante; Ford F550, del año 199, Tablilla H20089, Registro Número 5564204; Omni Trailer, del año 1988, Tablilla 121545A, Registro Número 3017853; Ford F350 Super Duty, color blanco, del año 2003, Tablilla H41206, Registro Número 6245774; Camión ETNYRE International Trailer, del año 2000, Tablilla 58653A, Número de Serie 1E9TA42748YE007038, número de Registro 5757834; Ford F550, color blanco, del año 2000, Tablilla H44197, Registro Número 11034893; Ford F450, del año 2002, Tablilla H28438, Registro Número 5978213; Ford F150, color blanco, del año 2005, Tablilla 809410, Registro Número 6689952; Arrastre, Tablilla 55040A, registrado a nombre de Alco comprado en subasta.

5. La parte demandante durante el año 2010 y con posterioridad al año 2010 estaba llevando diversas conversaciones transaccionales con el Oriental Bank y de manera paralela con el FDIC debido a que existían obligaciones incurridas y/o adquiridas por la parte demandante con el Eurobank.

6. Durante los años de las conversaciones con el FDIC y Oriental Bank, quien había adquirido los activos del Eurobank, **la parte demandante se vio amenazada, específicamente la operación de Hot Asphalt Paving, Inc., por lo cual la parte demandante acordó con el demandado, Ramón Torres (su hijo) traspasar temporalmente los equipos de la demandante que estuvieran inscritos a nombre de Hot Asphalt Paving, Inc. en el DTOP, a nombre de Ramón Torres ya que esa estrategia evitaría el riesgo de perderlos y pudiera seguir haciendo negocios. Posteriormente, y una vez se resolvieran los asuntos del riesgo con el banco, los equipos pasarían nuevamente a nombre de la parte demandante.**

7. **El acuerdo entre la parte demandante y el Sr. Ramón Torres fue únicamente en cuanto a los equipos que estaban inscritos en el DTOP y que están descritos en la determinación de hecho número 4 y en el párrafo número cuatro (4) de la Demanda.**

8. **En cuanto a los equipos descritos en la determinación de hechos número 3, no se hizo ningún acuerdo ya que no estaban inscritos en el DTOP y era más difícil el embargo o anotación de demanda ya que no estaban registrados.**

9. Desde que se hicieron los traspasos hasta el año 2016 todos los equipos permanecieron en las facilidades de Hot Asphalt Paving, Inc.

10. Durante el año 2015 y 2016 el Sr. Ramón Torres continuó como empleado de Hot Asphalt Paving, Inc. y hacía trabajos en su carácter personal, Ramón Torres buscaba los equipos en las facilidades de Hot Asphalt, los utilizaba y los devolvía con un pago a José Luis Torres Negrón. Durante todo ese tiempo Hot Asphalt utilizaba los equipos y no pagaba nada al demandado. Todos los documentos de traspaso y titularidad permanecían en las oficinas de las facilidades de la parte demandante; el demandante pagó los seguros, las reparaciones, los mantenimientos y piezas de todos los equipos.

11. El 14 de diciembre de 2015, la parte demandante llega a una estipulación con Oriental Bank en el caso número G4CI201400207.

12. **Una vez resuelto el proceso con el banco, la parte demandante solicitó a Ramón Torres le traspasara nuevamente los equipos a la parte demandante, a principios del año 2016, según habían acordado.**

13. Posteriormente, durante el año 2016, Ramón Torres en ausencia del presidente de Hot Asphalt, José Luis Torres Negrón, sacó de las facilidades de la parte demandante durante un fin de semana los equipos nombrados en la determinación de hechos número 3, que están descritos en el párrafo número tres (3) de la Demanda, que no habían sido traspasados al demandado y parte de los equipos nombrados en la determinación de hechos número 6, que están descritos en el párrafo número cuatro (4) de la Demanda. Al Sr. José Luis Torres Negrón percatarse de que faltaban equipos y advenir en conocimiento de que Ramón Torres se los había llevado, le prohibió la entrada a las facilidades de la parte demandante.

14. Ramón Torres se negó a realizar los traspasos nuevamente a nombre de Hot Asphalt Paving, Inc.

15. En el 2016 la parte demandante comenzó a hacer gestiones para tratar de lograr la entrega de los equipos y hacer los debidos traspasos, hasta que en el 2019 se presentó en el Tribunal la demanda PO2019CV02467, posteriormente desistida por la parte demandante.

16. El 6 de julio de 2020 la parte demandante presentó la Demanda de autos reclamando la entrega inmediata de los equipos a la parte demandante.

17. Al presente la parte demandada afirma que su padre, presidente y dueño de Hot Asphalt le había cedido los equipos como donación de bienes muebles, con la liberalidad de la entrega y la aceptación de la otra parte, o en la alternativa, por prescripción adquisitiva.

### Testimonio del Sr. José L. Torres Negrón

18. A preguntas en interrogatorio, y para efectos del récord, el testigo se identificó como José Luis Torres Negrón, soltero, fundador de la corporación Hot Asphalt Paving, Inc., la cual está actualmente inoperante y activa en el Departamento de Estado.

19. Declaró que Ramón Torres Rivera es su hijo y RT Asphalt, Inc. es una corporación que fundó Ramón Torres para el año 2016 o 2017.

20. Manifestó que Trinidad Burgos Rodríguez es la secretaria que ha estado por los últimos 15 o 16 años con él, para Hot Asphalt y para el demandante. Esta mantiene las licencias al día, lleva los cuadres del demandante, prácticamente todo lo que tiene que ver con la oficina.

21. Expresó que Héctor Luis Torres Miranda es su otro hijo, quien trabaja en el gravero, una planta de procesamiento de materiales perteneciente al demandante, que se llamaba Salinas Asphalt que actualmente no está activa. Salinas Asphalt era una compañía que fundó el demandante hace años, cuyo presidente era José Luis.

22. Declaró que Ana Torres Rivera es su hija, trabajaba en la oficina encargada de lo que tenía que ver con los hormigones y era secretaria de Hot Asphalt.

23. Con relación a la Demanda de este caso, manifestó que los siguientes equipos pertenecen a Hot Asphalt: un Blow Knox Paver, del año 1999; un Leeboy Paver del año 2001; un Bomag Vibrator del año 2000; un Newholland Tractor del año 2004; un Duopact Roller del año 1998; un Dynapac Roller, modelo CC-142; una máquina de pintar líneas y tanque de 1,000 galones. Indicó que estos equipos los posee el Sr. Ramón Torres, llevándoselos sin autorización en el año 2015 o 2016. Expresó que estos equipos estaban ubicados en las facilidades de Hot Asphalt antes que el Sr. Ramón Torres se los llevara. Manifestó que el Sr. Ramón Torres no tenía autorización alguna para llevarse los equipos.

24. Declaró que los siguientes equipos pertenecen a Hot Asphalt: un Benson, Tumba del año 2001, otro Benson, Tumba del año 2001, un Kenworth, T800 del año 2000, un vehículo Dodge del año 2009, un Ford Conventional del año 1998, un Ford F150 verde, del año 1999, un Kenworth T800 rojo, del año 2000, otro Dodge RAM1500, del año 2005, un MACK, Modelo TK, del año 1982, otro vehículo Dodge, RAM1500, del año 2011, color rojo, un Tumba Summit TRLR, color gris, del año 2000; un Mercedes

Benz S500, color gris; Camión Western, Modelo STA, del año 2001; que usted menciona que ese vehículo (digo en la Demanda) que tiene un tanque de 1,000 galones; un Ford F550, Tablilla H20089; un Omni Trailer, Tablilla 121545A; un Ford F350 del año 2003; un Camión ETNYRE International, del año 2000; un Ford F550, del año 2000; un Ford F450, del año 2002; un Ford F150, del año 2005; y un Arrastre registrado a nombre de Alco. Afirmó que con excepción del Arrastre 54040A registrado a nombre de Alco, los demás equipos estaban inscritos a nombre de Hot Asphalt y posteriormente en un acuerdo se pasó a nombre de Ramón Luis Torres Rivera.

25. **Expresó que entre el 2009 al 2014 el demandante pasó por unas situaciones económicas fuertes, el Eurobank y luego pasó a ser Oriental, le amenazaron con embargarle todo y unas deudas que tenía con Hacienda le estaban presionando para que resolviera el problema y viendo que podía suceder unos embargos de momento, acordó con el Sr. Ramón Torres pasar ciertos equipos a nombre de él por si acaso venía un embargo pudieran seguir trabajando. El acuerdo consistía en que si posteriormente resolvía se iban a pasar todos los equipos de nuevo a nombre de Hot Asphalt.**

26. **Declaró que el asunto de Oriental Bank en términos del Tribunal culminó en una Demanda. Indicó que en ese caso negoció con Oriental Bank con unas propiedades y saldó la deuda, recogiéndose el acuerdo a través del Tribunal.** Mostrado el Exhibit 4, en la página 6 al 9, documento titulado Estipulación, expuso que el documento tiene la firma de José Luis Torres Negrón y por Oriental, Francisco Ríos Nogueras. El demandante era Oriental Bank, número de caso G4CI201400207, siendo los demandados Salinas Asphalt, José Luis Negrón, Hot Asphalt, Peñuelas Aggregates, Caño Verde Ready Mix. Manifestó que el Exhibit 4 significó unos acuerdos y arreglos que cerró el caso. Mostrado el Exhibit 4, página 1 de 9, la Sentencia fue notificada el 14 de diciembre de 2015.

27. Expresó que posterior al 14 de diciembre de 2015 los equipos fueron llevados por Ramón Torres, fue un weekend y se los llevó de la planta.

28. Declaró que el acuerdo con relación a donde permanecerían los equipos era que estos permanecerían en las facilidades de Hot Asphalt y permanecieron hasta el 2015 o 2016.

29. Indicó que hasta el año 2015 Hot Asphalt, con relación a la utilización de los equipos, se hacían poquitos proyectos, mayormente había unas que otras chiripas que aparecían que las hacía Ramon Torres y le pagaba por el uso de los equipos.

30. Manifestó que cuando logró resolver ya en el 2015, va donde el Sr. Ramón Torres a decirle que había que regresar todos los equipos de nuevo para atrás, él dijo que no, que esos equipos eran de él y se los llevó todos. Declaró haberle indicado a Ramón Torres que tenía que regresar todos los equipos para atrás y hacer los traspasos de los equipos que estaban a su nombre. Esto ocurrió en la misma planta, cuando le dice a Ramón Torres que tenían que volver a reponer todos los equipos para atrás y Ramón le dijo que no, "negativo" fue la palabra que él usó. Indicó haber

realizado varios acercamientos personalmente a Ramón Torres; posteriormente fue donde el Lcdo. Santiago Llorens y luego donde el Lcdo. Rafael Torres Torres buscando terminar los acercamientos que había hecho para que llamaran a Ramón Torres para recuperar los equipos.

31. Con relación a los equipos mencionados en el inciso 3 de la Demanda, los equipos no registrados en el Departamento de Transportación y Obras Públicas, indicó que los tiene el Sr. Ramón Torres. Manifestó que en un momento dado como en el año 2015 Ramón Torres se dedicó a hacer ciertos trabajitos de los cuales le daba una participación al demandante, una regalía, pero no hubo ningún acuerdo de que Ramón Torres se los llevara.

32. Mostrado el Exhibit 5, expresó haber visto ese documento anteriormente, porque fue donde el Lcdo. Rafael Torres para buscar un acercamiento a ver si se podía resolver el problema lo antes posible, para que le devolvieran los equipos que estaba reclamando. El documento es una carta dirigida al Sr. Ramón Luis Torres, con relación a la devolución de todos los equipos, dice: "Reclamación de Devolución de Equipos Propiedad de Hot Asphalt que ilegalmente traspasados y que están en posesión suyos o de la corporación de su propiedad". Al no obtener resultado con esa gestión, posteriormente visitó la oficina del Lcdo. Carlos J. García Morales para reclamar a través de la ley.

33. Declaró que Hot Asphalt adquirió esos equipos a base de una transferencia que se hizo de Salinas Asphalt, en ese acuerdo Hot Asphalt fue representada le parece que, por Ana Rosario, siendo el presidente de Hot Asphalt y Salinas Asphalt el Sr. José Luis Torres Negrón.

34. Mostrada la Identificación 4, la parte demandada no tuvo objeción de que se reconociera este documento como Exhibit 1 de la parte demandante, incluyendo la certificación registral desde la página 1 a la 11. Revisada la página 2 dice: Acuerdo Privativo de Cesión y/o Permuta de activos con motivo de reorganización corporativa. El documento es firmado por José Luis Torres Negrón quien firma por Hot Asphalt y Salinas Asphalt. Indicó que el acuerdo era para mover los equipos de Salinas Asphalt para Hot Asphalt, convirtiéndose Hot Asphalt en dueño de esos equipos, siendo estos los mismos equipos relacionados con la Demanda de este caso.

35. Con relación a los equipos que están en el Exhibit 1 A al 1 DD estipulado, declaró que el dueño de esos equipos que están inscritos a nombre de Ramón Torres es Hot Asphalt y **están inscritos a nombre de Ramón Torres por un acuerdo verbal que tuvo este con Ramón con relación a posible demanda que venía por si acaso sucedía eso tener con qué trabajar posteriormente a eso, y todavía están inscritos a nombre de Ramón porque no ha querido honrar el acuerdo verbal que había.**

36. **Manifestó que Hot Asphalt no ha recibido dinero por esos traspasos y que el motivo fundamental del acuerdo era las deudas en lo que se resolvía para posteriormente traerlos de nuevo a la corporación para seguir trabajando.**

37. Indicó que previo al año 2016 el Sr. Ramón Torres trabajaba con el demandante en Hot Asphalt, haciendo el trabajo de las brigadas, de entregar y compactar asfalto. Expresó que, a la mitad del 2013, al 2014 o 2015 por ahí, Ramón encontraba chiripas las hacía y le pagaba a Hot Asphalt una regalía por el uso de los equipos, por ser el dueño de los equipos. Declaró que ese dinero que pagaba Ramón Torres a Hot Asphalt se usaba en ocasiones para nómina y para gastos operacionales de lo poquito que había, refiriéndose a los años 2013 al 2015 por ahí. Afirmó que en ocasiones tuvo que empeñar sus prendas para pagar la nómina, entregándolas a Ramón Torres quien iba y las empeñaba y con eso se pagaban las nóminas.

38. Informó que Hot Asphalt no tiene control de los equipos desde el 2016 para acá y a partir de esa fecha Hot Asphalt está inoperante porque no tiene los equipos ni va a subastas ni na. Afirmó que si Hot Asphalt tuviera los equipos estuviera trabajando, estuviera subcontratando trabajos a otras compañías de regado y compacto de asfalto. Indicó que Hot Asphalt hace eso desde hace 25 años; empezó regando y compactando asfalto, posterior se hizo de las plantas y luego salió de las plantas y hubiese seguido como empezó, regando y compactando asfalto a través de subcontrato, lo que no puede hacer porque no tiene los equipos suficientes. No puede rentar equipos porque en muchas ocasiones no es costo efectivo porque si tiene que pagar al mes un trabajo de $1,000 o $1,500 y tiene que alquilar los equipos, va a pagar más renta de equipo que lo que le deja el trabajo.

39. Con relación a las deudas de Hacienda, declaró haberlas pagado.

40. Expresó que si tuviera que alquilar la totalidad de los equipos para poder hacer trabajos tendría que pagar mensualmente más de 30 o 40 mil pesos.

41. Indicó que el Sr. Ramón Torres trabajó en Hot Asphalt hasta el 2016, momento en que le reclamó le entregara los equipos y él no los quiso entregar, entonces se fue y no vino más.

42. Manifestó que de todo lo declarado lo que solicita al Tribunal es la devolución de todos los equipos que le pertenecen.

43. A preguntas en contrainterrogatorio, el demandante declaró que cuando dijo "la devolución de todos los equipos míos" se refería a Hot Asphalt. Negó haber presentado Resolución corporativa ni documento de la corporación que le autorice radicar la demanda y que realiza el reclamo en representación de la compañía.

44. Indicó que actualmente no hay ejecutivo en Hot Asphalt, solo él como presidente.

45. Informó que para el 2013, 2014 y 2015 Hot Asphalt realizó muy pocos proyectos y que para el 2013 estaban en la parte de reorganizar.

46. Aceptó que en el 2014 se radicó una Demanda en su contra por Cobro de Dinero por Oriental Bank.

47. **Aceptó que voluntariamente pasó los equipos al demandado, con el propósito de evitar que se paralizaran sus labores y vienen traspasándose desde el 2009.**

48. Indicó que tuvo una excelente relación con el demandado hasta el 2016.

49. **Con relación al Exhibit 5 estipulado, dijo que el título de la carta expresa que se traspasaron ilegalmente, pero afirmó que los vehículos no se traspasaron de manera ilegal.**

50. A solicitud de la parte demandada, el Tribunal tomó conocimiento judicial del caso PO20219CV02467. Con relación a la alegación 5 de la Demanda en el caso PO2019CV02467, que dice:

> Que los equipos mencionados en el párrafo anterior iban a ser registrados a nombre de otra corporación perteneciente al Presidente de la Parte Demandante, José Torres Negrón. El Sr. José Torres Negrón en representación de la parte demandante firmó los correspondientes Certificados de Títulos de Propiedad para la transferencia de dueño. El Sr. Ramón Torres Rivera, que trabaja con la parte demandante, era la persona encargada para diligenciar los correspondientes traspasos. El Sr. Ramón Torres Rivera en un acto ilegal, valiéndose del puesto que desempeñaba y cometiendo un acto de enriquecimiento injusto, registro los equipos a su nombre. Dichos equipos en adición a los mencionados en el párrafo número cuatro (4) de la presente Demanda están siendo utilizados por todas las partes co-demandadas obteniendo beneficio económico, sin darle el debido mantenimiento, en completo reconocimiento que todos los equipos pertenecen a la parte demandante y privando a la parte demandante de su utilización. La parte demandante ha sufrido enormes daños que se mencionarán más adelante.

51. Testificó que lo anterior es cierto. **Declaró que autorizó a que se pusieran los vehículos a nombre de Ramón Torres, por mutuo acuerdo.**

52. Negó haber intervenido en las cotizaciones que hacía Ramón Torres en los trabajos que él realizaba. Tampoco depositó el dinero que le pagaba el Sr. Ramón Torres en la cuenta de banco para pagar las nóminas de la corporación.

53. Con relación al Exhibit 1 de la demandante: Acuerdo de Cesión, haciendo referencia a las páginas 9-11, Anejo A, aceptó que es el acuerdo en que se pasan los bienes, la cesión de bienes entre Salinas Asphalt y Hot Asphalt, y que como parte del acuerdo se le dio un valor a cada equipo. Aceptó que el documento tiene un anejo en que se unen los equipos que se traspasaron con su correspondiente costo, la depreciación acumulada y que todos los vehículos después de haberlos depreciado valen menos de lo que costaron, según los libros.

54. Declaró que en el 2009 traspasó un vehículo a favor de Ramón Torres, comprado a Horacio Maldonado que

posteriormente este le compró tanque de brea, pero no recuerda bien.

55. Afirmó no saber si Obras Públicas guarda copia de las Resoluciones corporativas.

56. Manifestó tenerle confianza a su hijo al momento del traspaso, aunque no quería que le embargaran los bienes, estos estaban en la planta.

57. Aceptó no haber hecho una querella cuando en 2015 le llevaron 10 equipos de tirar asfalto y cerca de 20 vehículos, negó que fueran 20 equipos. En ningún momento hizo una querella. Expresó haber trabajado poco en 2015, 2016 y 2017. Afirmó siempre haber trabajado, pero no tirando asfalto porque no tenía equipo. Aceptó haber esperado hasta el 2017 para hablar con el Lcdo. Santiago Lloréns y que no se rindió fruto alguno de esa gestión, hasta el 2019 que se radica una demanda, se desiste y en el 2020 se radica la presente demanda en el Tribunal. Aceptó que nunca hubo un reclamo de arrendamiento por los equipos.

58. Las partes estipularon 5 páginas de fotos que estaban marcadas como Identificación 3A al 3D como Exhibit 7A al 7D.

59. Aceptó haber reclamado como parte de la Demanda el Newholland 3010 y que todavía conserva las facilidades donde estaba Hot Asphalt, porque lo que él vendió fue el pavimento. Mostrado el Exhibit 7D, página 4, la foto del centro la identificó como el Newholland 3010 y sus facilidades; y la foto de arriba de la misma página la identificó como sus facilidades.

60. Aceptó haber trabajado en Super Asphalt en Salinas en la Urbanización Las Margaritas hace como un año o uno y medio.

61. Expresó que Ramón Torres tenía en su Corporación la posición de Tesorero y regando y compactando asfalto, eso fue como del año 2010 al 2015.

62. Indicó que, para ese tiempo, no recuerda la fecha en que ocurrieron los trabajos que Ramón Torres hacía de manera privada o trabajos que el demandante contrataba por el gobierno.

63. Indicó que su otro hijo Héctor Luis Torres está trabajando para él desde hace años. Para la fecha de los hechos Héctor Luis estuvo un tiempo fuera.

64. No recuerda haber reportado como ingreso de Hot Asphalt las regalías que le daba el demandado, ni al Departamento de Hacienda.

65. Aceptó haberle dado varias guaguas RAM al demandado, a nombre del demandado y las pagaba Hot Asphalt. Afirmó que el Mercedes 500 que el testigo utilizaba era privativo de este y se pagaba individual. Negó haber dicho que el sueldo suyo en Hot Asphalt era de $1,000 mensuales y que si lo dijo es un error suyo.

66. Mostrado el Exhibit 3 página 26, Transcripción de la Deposición se le preguntó al testigo "¿cuál era el salario suyo al año en Hot Asphalt?" y el testigo contestó "que yo recuerde como $1,000 pesos mensuales". Mostrada la página 27, línea 15, se le

preguntó si el testigo tenía conocimiento que el Mercedes S500 del 2000 vale $160,000 y el testigo contestó que no tenía conocimiento. Indicó que el recuerda haber contestado que costó $108,000.

67. Testificó que en ese entonces tenía unos camiones que no tenían que ver con la corporación Hot Asphalt como otra fuente de ingresos.

68. Declaró no haber puesto otros vehículos de Hot Asphalt o personales a nombre de otra persona para protegerse de alguna demanda, sólo a nombre de Ramón Torres. Los vehículos de Salinas Asphalt se transfirieron a Hot Asphalt. Indicó que no existe Resolución corporativa o Cesión de derechos sobre esos camiones que se transfirieron de Salinas Asphalt a Hot Asphalt. Aclaró que lo que se transfirió a Hot Asphalt fueron equipos de asfalto no camiones.

69. Aceptó que en su momento Peñuelas Aggregates Corp fue de su propiedad y que no se transfirieron bienes de Peñuelas Aggregates ni de Caño Verde Ready Mix, Corp., a nombre de otra persona para protegerlos. Aceptó haber sido presidente de Salinas Asphalt, Peñuelas Aggregates y Caño Verde Ready Mix. Indicó que solamente los bienes de Hot Asphalt fueron puestos a nombre de Ramón Torres desde el 2009.

70. Declaró haber tenido dos corporaciones de asfalto, Salinas Asphalt y Hot Asphalt. No recuerda cuando Salinas Asphalt dejó de estar en funciones. Indicó que Hot Asphalt comenzó a funcionar hace como 28 años, alrededor de 25 años.

71. Testificó que en ese momento su abogado era Rafael Torres Torres.

72. No recuerda si al ser demandado en el 2014 le pidieron las Resoluciones corporativas ni que haya entregado algún documento, se pagó y se resolvió el problema. Expresó no recordar haberse realizado Resolución corporativa cuando se le permitía a Ramón Torres utilizar los equipos entre el 2013 y el 2015, que éste utilizaba los equipos esporádicamente, no era el mes completo. No recibía dinero con tanta frecuencia, pero si los recibía.

73. Declaró que las decisiones de Hot Asphalt no eran tomadas por éste solamente, pero no recuerda cuando la Junta de Hot Asphalt se reunió para tomar la decisión de pasar los equipos a Ramón Torres. Aceptó que hay evidencia de transferencia de vehículos desde 2009 a 2014.

74. Mostrado el Exhibit 1 del demandante, aceptó era una movida económicamente razonable sacar 3 equipos entre el 2009 y 2010 y ponerlos a nombre de Ramón Torres y que en el 2010 se realizó la Cesión de Derechos de equipos de Salinas Asphalt a Hot Asphalt, la corporación que el testigo pasó bienes de ella para protegerla, en 2010 puso a nombre de esa corporación Hot Asphalt 44 equipos nuevos de Salinas Asphalt. Indicó que los 44 equipos transferidos a Hot Asphalt eran vitales para el funcionamiento de Salinas Asphalt y que si por alguna razón los embargaban la corporación dejaba de existir. Expresó que todos esos bienes se quedaron en Hot Asphalt hasta el 2016, a pesar

de que en 2014 se había radicado la Demanda en contra del testigo, Hot Asphalt, Salinas Asphalt y demás corporaciones, en su mente estaba resolver el problema.

75. Negó que Trinidad Burgos haya sido ni presidenta, ni tesorera, ni secretaria de la corporación a nivel del Departamento de Estado, era una empleada con múltiples funciones.

76. Manifestó que entre los años 2009 al 2017 su otro hijo Héctor no fungía como funcionario de la corporación a nivel ejecutivo.

77. Mostrado el Exhibit 3, página 13, declaró que no había que falsificar documentos porque hubo una reunión entre el Sr. Ramón Torres, Ana Torres y el testigo y todos estuvieron de acuerdo con hacer el traspaso de los equipos. Sobre si recuerda haber dicho que, si se falsificaron Resoluciones corporativas, declaró no recordar bien.

78. Mostrada la línea 18 a 21 de la Transcripción de la deposición, y luego de que el Tribunal realizara las advertencias sobre la admisión de comisión de delito, se recesó la vista para que el testigo consultara con su abogado.

79. Reanudada la vista y el contrainterrogatorio, el testigo aceptó haber dicho en la deposición que se falsificaron resoluciones corporativas para traspasar esos vehículos, pero que sí hubo consentimiento para el traspaso.

80. Expresó que el para 2016 la corporación tenía como 5, 6 o 7 empleados, entre 5 y 10 más o menos.

81. Manifestó que la última vez que vio los equipos fue en el 2016, sólo los ha vuelto a ver en la calle y se ven en las mismas condiciones que cuando se los llevaron, no desmejoran tanto a pesar de los años.

82. Mostrado el Exhibit 7, D4, foto del medio, reconoció el tractor 3010 que está en sus facilidades. En la página 3, Exhibit 7C, aceptó que la tercera foto está en posesión del Sr. Ramón Torres, y es el gemelo del que está en su terreno, así como en las mismas condiciones, el suyo le hace falta un poquito de pintura. Indicó que el equipo detrás de tracto es el de tirar asfalto, de los mismos que se encuentran en la página 4, la última foto, que, aunque no se están utilizando se le da mantenimiento y que las fotos no son recientes.

83. Informó que su hijo, mientras trabajaba con él, se dedicaba a regar y compactar asfalto; ahora están independiente, tira y riega asfalto aparte y esa es su fuente de sustento.

84. No recuerda exactamente hace cuantos años vendió la hormigonera, unos 7 o 6 años.

85. Entre el 2010 al 2016 tenía 5 hijos trabajando con él, entre que se iban y venían. Héctor iba y venía; Ana se fue para el 2016 y era secretaria de la Corporación; Luis tuvo diferencias con el testigo y se fue; el testigo tuvo un problema legal con Fabialy y también se había ido para el 2016. Ramón Torres era quien trabajaba con el testigo desde mucho antes del 2010 hasta el 2016; empezó desde abajo igual como empezó el testigo. Negó que la compañía que su hijo tiene fuera montada bajo las mismas circunstancias que las de él. Negó que haya dado un empujón a

Ramón Torres, éste hacía los trabajos y llevaba la renta de los equipos, prácticamente era como una renta, una regalía. Aceptó que desde el 2013 al 2016 el testigo ayudó a Ramón Torres y le permitía el uso de esos equipos sin una autorización de la Corporación.

86. A preguntas en redirecto al testigo José Luis Torres Negrón, declaró que el traspaso fue por mutuo acuerdo entre el Sr. Ramón Torres y él. Manifestó que el mutuo acuerdo era que se iba a pasar los equipos a nombre de él y tan pronto se terminaran los problemas económicos que tenía que estaba en proceso y encaminado para resolverlo, se iban a pasar los equipos de nuevo a nombre de la compañía. Expresó que en el acuerdo su obligación era hacer el traspaso a nombre del Sr. Ramón Torres en un mutuo acuerdo para proteger los intereses en ese momento de Hot Asphalt porque se aproximaba una posible demanda y éste estaba encaminado a resolver ese problema y en lo que se resolvía y que posteriormente se iban a pasar de nuevo a nombre de la compañía.

87. Sobre el párrafo número 5 de la Demanda de 2019 del caso PO2019CV02467, sobre a qué se refirió éste en la Demanda con relación a un acto ilegal de parte de Don Ramón, declaró "Yo firmé las Resoluciones, lo que hayan hecho posteriormente después de esas Resoluciones yo no sé". Sobre las expresiones del testigo de que Ramón Torres obtuvo un enriquecimiento injusto con el registro de los equipos a su nombre, expresó que prácticamente a esta fecha él tardó 15 años para comprarse un Mercedes del 2000.

88. Distinguió que en la demanda del 2019 y la demanda del 2020 se hizo referencia a unos equipos que no estaban registrados en Obras Públicas y otros que estaban registrados. Con relación a las dos Demandas, declaró que son distintos porque unos son equipos inscritos y otros sin inscribir, pero que ambas peticiones comparadas son iguales.

89. Sobre el porqué no hizo una querella en la Policía, expresó que no se hizo querella en la Policía porque cuando se llegó el momento de hacer las transferencias, se dialogó con el Sr. Ramón Torres y él le dijo "negativo todo eso es mío"; y porque buscaba resolver el problema porque es padre e hijo.

90. Manifestó haber contratado al Lcdo. Santiago Lloréns con la idea de ver este caso en su fondo con él, sin embargo, no procedió la gestión con el Lcdo. Santiago Lloréns, y tardó como un año en lo que el testigo hace gestiones con el Sr. Ramón Torres es que posteriormente el testigo va donde el abogado. Cuando el Lcdo. Santiago Lloréns le dice que no puede ver el caso, inmediatamente va donde el Lcdo. Torres para ver el caso también, pero éste no podía ver el caso porque le había hecho unas affidávits al Sr. Ramón Torres.

91. Después de la contratación del Lcdo. Rafael Torres, no hizo una querella buscando siempre el acercamiento a ver si se podía resolver sin tener que llegar a estos extremos.

92. Manifestó que el Sr. Ramón Torres hacía unos trabajos y eran trabajos pequeños que llegan, usaba los equipos y por el uso de los equipos le pagaba un dinero, como una renta o regalía.

Expresó que el dueño de esos equipos y a nombre de quién estaban inscritos era Hot Asphalt.

93. Indicó que las resoluciones corporativas en un momento dado, el Sr. Ramón Torres se llevó todo lo que había en la oficina, todo lo que tenía que ver con las resoluciones y los equipos sin ningún permiso.

94. Testificó que a pesar de los traspasos desde el 2009 hasta el 2014, los equipos permanecían en las facilidades porque según el acuerdo verbal y mutuo acuerdo que tenía con el Sr. Ramón Torres, eran de la compañía y era solamente ponerlos a nombre de él para protegerlos; no era para pasárselos para que se los llevara, sino tenían que quedarse en la compañía.

95. Declaró que todos los equipos que no están inscritos en el DTOP tienen número de serie, van 24 años que compró los equipos y no recuerda los números de serie. Expresó que los equipos que no están inscritos en el DTOP son diferentes a los que reclamó en el párrafo número 3 de la Demanda, porque unos son vehículos que corren en la carretera, tienen tablillas y se le paga al gobierno por los marbetes y los otros no tienen licencia ni pagan marbete. Identificó los que tienen licencia y marbete como "un Stental", un Kenworth, una vagoneta Benson, un Dodge RAM roja y una blanca, que recuerde ahora mismo, pero hay algunos más.

96. Sobre los que no tienen licencia ni marbete, indicó la escoba que el Lcdo. José Torres Nolasco le enseñó el día anterior, con la máquina BlowKnox que el licenciado le enseñó el día anterior, tres rolos, dos máquinas de asfalto, la máquina de pintar líneas, el carretón que no se le ha sacado marbete, el tanque de brea, faltarían algunos, pero están dentro de los papeles.

97. Sobre el Mercedes S500, manifestó haber comprado ese vehículo en el 2000, por un costo de $108,000.00.

98. Expresó que su situación financiera y de las corporaciones para el año 2000 vs el año 2014, había abundancia en trabajo, abundancia en todo, comparado con el 2014; todo estaba como hasta el 2008 por ahí era abundancia, de ahí pa'lante es que fue decayendo la construcción y decayendo el negocio.

99. Testificó que al comprar el Mercedes Benz que le costó $108,000.00 su salario era $1,500.00 entre todo y que cuando en la deposición contestó $1,000.00 mensuales fue un error porque nunca ha ganado $1,000.00 mensuales. Afirmó que para el año 2014 cobraba prácticamente nada, de acuerdo con la regalía.

100. Con relación al poco trabajo que había, expresó que daba para la nómina, era que se tardaban en pagar y en momentos dados no había dinero en las cuentas.

101. Sobre la relación de la corporación con los bancos desde el 2009 hasta el 2014, declaró que desde el 2009 al 2014 la relación con el banco se mantuvo en un dilema por las cuestiones de las deudas hasta el 2014 o 2015 que resolvió todo, comprando un préstamo; pagándose la Sentencia por un acuerdo entre el banco y ellos que se pagaron 2 millones de dólares.

102. Sobre cómo se sintió cuando vio los vehículos posteriores al 2016, testificó que se sintió mal, sin poder tener los equipos en su poder y el Sr. Ramón Torres disfrutando de ellos.

103. Mostrado el Exhibit 7C, la primera foto, describe lo que ve como el rolo, las máquinas de asfalto, no ve bien atrás si está la escoba. Comparados esos dos equipos con los nombrados en el párrafo número 3 de la Demanda, expresó que están nombrados en la Demanda y pertenecen a Hot Asphalt.

104. Mostrada la última foto del Exhibit 7C, identificó la escoba, la Blowknox y el rolo. Comparados esos equipos con los nombrados en el párrafo número 3 de la Demanda, indicó que son parte de los de Hot Asphalt. En la foto identificó otro equipo como el carretón y el camión.

105. A preguntas del Tribunal, identificó el carretón como la última foto de la página tres.

106. Continuado el redirecto, con relación a los equipos del Exhibit 7D, de la página 4, expresó que están en posesión del Sr. Ramón Torres y son los mismos que están en el párrafo número 3 de la Demanda.

107. Mostrado el Exhibit 1 de la parte demandante, expresó recordar que se le hicieron preguntas con relación a este Exhibit. Explicó que, porque diga que el book value está en 0, ese no es el valor que tiene el equipo actualmente. Por ejemplo, si vamos al Blowknox como tal aparece en 0, el valor de esa máquina ahora mismo está sobre los $108,000.00, $75,000.00, por tanto, el book value con el valor real no es lógico.

108. Manifestó que se pasaron los equipos a nombre de Hot Asphalt como una reorganización que se hizo por recomendación de los contables. Indicó que los equipos del Anejo A, Exhibit 1 de la parte demandante, casi todos esos equipos no son inscritos en Obras Públicas, hay uno que tiene tablilla.

109. Declaró que los equipos traspasados a Hot Asphalt en el 2010, se registraban en los libros.

110. Expresó que el camión suyo personal del cual no había tomado medidas era un solo camión que posteriormente lo vendió.

111. Sobre el desarrollo del negocio de su hijo, testificó que se había desarrollado no bajo las mismas condiciones que él, se refirió a que cuando su abuelo lo crió, el testigo trabajó un tiempo en la Cervecería India; posteriormente se compró un camión y fue como un empujoncito que el abuelo le dio para que él echara pa'lante; comparado a la forma que el Sr. Torres Rivera hizo que se llevó todos los equipos, que no fue la misma comparación. Indicó que esos equipos que se llevó el Sr. Ramón Torres pertenecían a Hot Asphalt.

112. A preguntas en recontrainterrogatorio sobre el Exhibit 1 de la parte demandante, página 1 del Anejo A, del segundo equipo el Etnyre Asphalt Tank, declaró que tenía 3 Etnyre: uno de 9,000 galones, otro de 1,500, de 1,000 y uno de 600 galones, algo así. Indicó que no es el mismo que está inscrito a nombre de Alco Corporation, el que está inscrito a nombre de Alco Corporation

es la plataforma donde estaban puestas las máquinas que todavía no se ha hecho traspaso y no sabe cómo se están usando porque eso no se le puede sacar marbete.

113. Sobre el párrafo 3 de la Demanda de 2019 y el párrafo 3 de la Demanda de 2020, comparados los dos párrafos 4 o 5 que vio son los mismos equipos, aun cuando en el redirecto contestó que eran los mismos equipos.

114. El testigo hace lectura del párrafo 5 de la Demanda PO2019CV02467, marcado como Exhibit 1 de la parte demandada:

> Que los equipos mencionados en el párrafo anterior iban a ser registrados a nombre de otra corporación perteneciente al Presidente de la Parte Demandante, José Torres Negrón. El Sr. José Torres Negrón en representación de la parte demandante firmó los correspondientes Certificados de Títulos de Propiedad para la transferencia de dueño. El Sr. Ramón Torres Rivera, que trabaja con la parte demandante, era la persona encargada para diligenciar los correspondientes traspasos. El Sr. Ramón Torres Rivera en un acto ilegal, valiéndose del puesto que desempeñaba y cometiendo un acto de enriquecimiento injusto, registró los equipos a su nombre. Dichos equipos en adición a los mencionados en el párrafo número cuatro (4) de la presente Demanda están siendo utilizados por todas las partes co-demandadas obteniendo beneficio económico, sin darle el debido mantenimiento, en completo reconocimiento que todos los equipos pertenecen a la parte demandante y privando a la parte demandante de su utilización. La parte demandante ha sufrido enormes daños que se mencionarán más adelante.

115. El testigo hace lectura del párrafo 5 de la Demanda PO2020CV00948:

> Que los equipos mencionados en el párrafo 4 iban a ser registrados temporeramente a nombre de Ramón Torres Rivera. Los traspasos temporeros que se iban a realizar eran basados en una decisión de negocio del demandante en la búsqueda de la protección de los bienes corporativos. Posteriormente, los equipos serían devueltos y reinscritos a nombre del demandante cuando la parte demandante así lo ordenara. El Sr. José Torres Negrón en representación de la parte demandante firmó diversos Certificados de Títulos de Propiedad para la transferencia de dueño de los equipos nombrados en el párrafo cuatro (4) de esta demanda. El Sr. Ramón Torres Rivera, que trabajaba para la parte demandante, era el supervisor de proyecto y la persona encargada para diligenciar los correspondientes traspasos en la búsqueda de la protección de la propiedad corporativa. Dichos equipos mencionados en el párrafo número cuatro (4) de la presente Demanda y en el párrafo número tres (3) de la presente Demanda están siendo utilizados por todas las partes co-demandadas obteniendo beneficio económico, sin darle el debido mantenimiento, en completo reconocimiento que todos los equipos pertenecen a la parte demandante y privando a la parte demandante

de su utilización. La parte demandante ha sufrido enormes daños que se mencionarán más adelante.

116. Leído el párrafo 5 de la Demanda anterior y del párrafo 5 de la Demanda nueva, el testigo aceptó que el párrafo 5 de la Demanda del presente caso no habla de un acto ilegal de la parte demandada, y aceptó que el párrafo 5 de la Demanda de 2019 dice que el demandado hizo un acto ilegal poniéndose los equipos a su nombre. Se le muestra en su totalidad la Demanda de 2020 al testigo.

117. Haciendo referencia al Exhibit 1 de la parte demandada, en el párrafo 5, el testigo leyó cuidadosamente la oración en relación con el acto ilegal y al enriquecimiento injusto: "El Sr. Ramón Torres Rivera en un acto ilegal, valiéndose del puesto que desempeñaba y cometiendo un acto de enriquecimiento injusto, registró los equipos a su nombre". Indicó que el acto ilegal fue poner los equipos a nombre de él.

118. Mostrado el Exhibit 7 por estipulación, inciso D, página 4 de las fotos, negó haber dicho que el Newholland 3010 éste lo reparó y lo prestó a un amigo. Aclaró que el demandado tiene varios y él solo tiene uno, que los equipos que están en las fotos, el demandado tiene uno y él tiene otro. Expresó que son cuatro equipos iguales, dos Blowknox y dos escobas. Indicó que para identificar cuales equipos son los suyos tendría que verle la serie.

119. Mostrado el Exhibit 7C, foto 3, aceptó para saber si son sus equipos tiene que ver el número de serie, y no haber visto los números de serie de los equipos que están en la foto. Afirmó identificar al camión como los que tiene el demandado, así como el carretón que es de Hot Asphalt y los tiene el demandado, por lo que entiende que si los tiene el demandado son los equipos suyos. Indicó que desconoce cuántos tractores 3010 puede haber en el mercado; y haber dicho, conforme a la transcripción, que esos tractores los vendía R&B Power.

**Testimonio de la testigo, Trinidad Burgos Rodríguez**

120. A preguntas del representante legal de la parte demandante, expresó que su nombre es Trinidad Burgos Rodríguez, casada, trabaja en Río Nigua Ready Mix. Adicional trabajó en Hot Asphalt desde el 2004 hasta el presente, era la asistente del Project Manager, después seguido como Secretaria y Asistente del Sr. José Luis Torres. Identificó a Ramón Torres como que era uno de los supervisores de asfalto y el hijo del Sr. José Luis Torres.

121. Con relación al año 2009 aproximadamente, manifestó que había problemas financieros en Hot Asphalt por deudas que tuvo la compañía. Declaró desconocer hasta qué momento duró esa situación económica porque no estaba de per se con relación a la deuda de la compañía, había otras personas que bregaban con la contabilidad de la compañía, ella mayormente era del proyecto.

122. Con relación a unos traspasos de equipos que se hicieron aproximadamente del 2009 hasta el 2014 en Hot Asphalt, testificó que ella conoce de los traspasos porque trabajaba con eso, sus funciones era bregar con lo del vehículo, con los equipos: marbete, verificar todo que los vehículos estuvieran al día, todo

eso era parte de sus funciones por lo menos en cuanto a equipo y vehículos. Afirmó que hubo unos traspasos de vehículos al Sr. Ramón Torres. **Indicó que esos vehículos se traspasaron por los problemas que había financieros, para evitar que fueran embargados. Declaró que una vez pasara la situación financiera iban a volver otra vez a hacer el traspaso.** Desconoce si se preparó una Resolución Corporativa respecto a ese particular, y quién trabajó sobre esos particulares, no era parte de sus funciones. Sólo sabe que se hicieron los traspasos al Sr. Ramón Torres, pero hasta ahí.

123. Manifestó que, según su conocimiento como secretaria, la información con relación a su trabajo en relación a traspasos, licencias, marbetes y todo ese tipo de cosas se guardaba en su oficina, donde trabajaba. Sobre los documentos, expresó que los que quedan están en la oficina. Declaró que hubo una situación en que se ausentó en un tiempo de la oficina, dos días cree que fue, cuando regresó a la oficina todos los expedientes se los habían llevado. Sostuvo que para ese tiempo la Sra. Ana Torres también trabajaba con ella y cuando le pregunta dónde estaban los expedientes ella le indicó que se los había llevado el Sr. Ramón Torres; que habló con Ramón directamente que le tiene que devolver, entregarle los documentos, pero los vehículos y los files como él dice y él le contestó que sí que se los iba a entregar, pero una vez él los revisara. Indicó que el Sr. Ramón Torres devolvió todo lo que no estaba a nombre de él y todo lo que está a nombre de él, él se quedó con él y hasta ahí se quedó; todo lo que estaba a nombre de Hot y de José Luis Torres, porque había muchos vehículos, eso lo devolvió. De los equipos que no estaban inscritos en el DTOP, nunca tuvo un file porque como eso era compra y venta eso no estaba en su oficina, lo de ella eran los vehículos.

124. Trabajó en Hot Asphalt hasta mucho antes de María por ahí más o menos, 2016 por ahí que era que estaba vigente la compañía. Después de María y eso tuvo un lapso de tiempo que ella se fue casi un año y después regresó en el 2018 pero como Río Nigua Ready Mix. No sabe nada sobre lo que había pasado con el asunto de que se devolverían los equipos, esto para el tiempo de María.

125. A preguntas en contrainterrogatorio, sobre si la información que ha testificado de que los vehículos se iban a pasar y se iban a devolver, aceptó que se la dio su jefe, José Luis. Negó ser ejecutiva de la compañía, que el asunto de los traspasos estaba en los files. Aceptó no tener constancia de los equipos, tenía constancia de los vehículos. Desconoce el año en que comenzaron los traspasos.

126. Testificó que ahora mismo trabaja para Río Nigua Ready Mix y su jefe actual es Héctor M. Torres Miranda, hijo de José Luis.

127. Reiteró que se hicieron los traspasos, una vez que se hacen los traspasos es que se llevan los expedientes, pero no recuerda exactamente el año en que se hicieron.

128. Indicó que para el 2016 fue la última vez que trabajó para Hot Asphalt.

129. Aceptó que para el 2021 dio una declaración jurada que decía que para ese año quien trabajaba en la compañía era la hija de José Luis, llamada Charito y Ramón; y que volvió a trabajar después del Huracán María para el 2018 o 2019, fecha en que Hot Asphalt estaba sin labores, ella volvió a trabajar hasta el presente. Sostuvo que la compañía de la que estaba hablando no era Hot Asphalt, se le había cambiado el nombre a la compañía, porque trabajaba para Hot Asphalt que era construcción y asfalto y después entró a trabajar en lo de hormigón, que regresó a trabajar en hormigón. La compañía que entró era otra compañía de hormigón, no la de construcción y asfalto, con otros propietarios; comenzó a trabajarla José Luis Torres con el Sr. Héctor Quiñones y ahora la compañía es de Héctor Torres.

130. Testificó que desde el 2004 hasta el presente de una manera u otra ha trabajado para don Héctor y unos lapsos de tiempo que no trabajó para Don José Luis, cerca de 20 a 21 años, que se fue de la compañía a trabajar a otra compañía y no porque estaba enferma.

**Testimonio del testigo, Héctor Luis Torres Miranda**

131. A preguntas del representante legal del demandante, este expresó que su nombre es Héctor Luis Torres Miranda, que Don José Torres Negrón es su padre y Ramón Torres es su hermano de parte de padre.

132. Manifestó que Hot Asphalt Inc. es una compañía que es de su padre.

133. Sobre la relación suya con su hermano, indicó que no son muy allegados, pero han compartido, podían ir a un negocio, alguna fiesta, compartía con ellos.

134. Declaró que para el año 2009 al 2016 más o menos, Ramón Torres trabajó en la compañía de su padre, dentro de la corporación, Ramón trabajaba en la parte de asfalto y él trabajaba en la parte del gravero y de hormigón, eran dos áreas diferentes.

135. Testificó que hubo un tiempo en que la compañía Hot Asphalt tuvo problemas serios económicos. Indicó que las facilidades de Hot Asphalt están ubicadas en Salinas y es una compañía donde están todas las plantas ubicadas o cerca, todo se ve, todo está unido en el mismo sitio. Fue a las facilidades todo el tiempo que trabajó en la compañía.

136. Expresó que Hot Asphalt tenía equipo de asfalto, *paver*, rolo, todo el equipo completo, brigadas con equipo completo que se transportaban con los remolques; también eran de la compañía Hot Asphalt.

137. Sobre los equipos, manifestó que esos equipos se utilizaban para Hot Asphalt, pero hubo un tiempo donde la compañía tuvo serios problemas económicos y ya no están operando; su hermano hacía trabajos en la calle y utilizaba los equipos. Indicó conocer eso porque estaba allí y también veía en la calle los equipos trabajando; Ramón dando servicio, utilizaba los equipos para dar servicio de asfalto. Mencionó que los equipos estaban

custodiados en la planta. Informó que cuando veía a Ramón usando esos equipos, el testigo estaba en la planta y veía los movimientos de equipo, pero de ahí en fuera no decía nada.

138. Señaló que para año 2016, así como para el Huracán María, trabajaba ayudando a su papá en la compañía.

139. Respondió que con relación al Huracán María las facilidades sufrieron daños en el vado, el Huracán María se llevó el vado, que es un puente que se utiliza para pasar a la compañía.

140. Con relación a quienes trabajaron allí que éste conozca, comentó que él trabajó arreglando el vado en la compañía. Mencionó que mientras arreglaba el vado sabía que Ramón tenía el equipo de su papá, le hace un acercamiento que José Luis por la situación económica había perdido su casa, estaba viviendo alquilado, que el equipo que él tenía era razonable, que Ramón le comprara la casa que él había alquilado con opción a compra y así se pudiera transar que Ramón se quedara con los equipos de José Luis, los equipos de Hot Asphalt, para entonces dejar las cosas en armonía porque Ramón estaba utilizando el equipo de José Luis. Señaló que Ramón le dijo que cuando el testigo arreglara el vado él iba a devolver el equipo, lo cual se arregló el vado y nunca se hizo.

141. Sobre su capacidad, si alguna, para éste poder saber cuáles son los equipos como tal, expresó que hay rolo, hay paver, hay pick up, varios equipos que los tiene Ramón.

142. A preguntas en contrainterrogatorio, respondió que no trabajaba para Hot Asphalt y que los equipos de Hot Asphalt, los vehículos, las situaciones económicas no le constan de propio y personal conocimiento porque no trabajaba directamente con eso. Tampoco le consta de propio y personal conocimiento porqué razón Ramón tenía los equipos.

143. Reconoció que Ramón usaba los equipos porque Hot Asphalt no estaba trabajando, hecho que le consta.

144. Declaró no haber sido parte de la negociación entre Ramón y su papá, la cual desconoce.

145. A preguntas del Tribunal, explicó que en el momento en que indicó que nunca trabajó para Hot Asphalt trabajaba para la compañía del hormigón, perteneciente a José Luis. Aclaró que esa compañía no tenía relación con Hot Asphalt, eran dos compañías distintas.

### Testimonio de la testigo, Ana Torres Rivera

146. A preguntas del representante legal de la parte demandada, expresó que su nombre es Ana Torres Rivera.

147. Señaló que se encuentran ante el Tribunal porque José Luis demandó a su hermano, Ramón Torres por unos equipos. Mencionó tener conocimiento de la Demanda porque cuando todo esto se inició, José Luis le dio instrucciones de que hiciera las Declaraciones Juradas y los papeles pertinentes para que traspasara los equipos a Ramón. Respondió que esto ocurrió más

o menos entre el 2008 al 2013 que hubo diferentes Resoluciones y diferentes transacciones hasta que se pusieron todos los equipos que José Luis tiene a nombre de Ramón. Para ese momento la testigo era Secretaria Corporativa.

148. Explicó que José Luis le dio esos equipos a Ramón para que él pudiera empezar su negocio y salir hacia adelante; a parte que los trucks estaban hechos cantos, no estaban en su total función.

149. A preguntas de donde surge la información, declaró que José Luis le dijo que hiciera las gestiones pertinentes para pasar los vehículos y los equipos a nombre de Ramón. Sobre la información de que fuera "pa' que empezara su negocio", comentó que esta surge de las palabras del mismo José Luis Torres.

150. Testificó que estuvo trabajando en la corporación Hot Asphalt desde el 1998 hasta el 2016.

151. Admitió que existían otras maquinarias, que se encontraban en el terreno de Salinas, al lado de los talleres y tenían muchos problemas mecánicos, porque escuchaba cuando iban a mandar a comprar piezas; que el Sr. José Luis daba las instrucciones de comprar las piezas, "esto está dañao", se quedaban ahí los mecánicos ahí bregando.

152. Sobre qué pasó con las maquinarias en malas condiciones, declaró que muchas veces las arreglaban, salían al field, trabajaban, volvía pa'tras porque volvían y se dañaban, porque las reparaba, no las arreglaban de lleno; hasta que finalmente por autorización de José Luis se las dio a Ramón Torres Rivera para que empezara a trabajar y saliera pa'lante.

153. Mencionó que cuando se hizo todos los traspasos que los equipos estaban en poder de Ramón, Ramón empezó a pintarlas, arreglarlas, a ponerlas en sus mejores condiciones y ponerlas a trabajar; esto cuando los equipos ya estaban a nombre y en posesión de Ramón legalmente que se hicieron todos los trámites, entonces él empezó a hacer todo, pero no recuerda la fecha de cuando eso ocurrió ni hasta cuando las maquinarias permanecieron en las facilidades de Hot Asphalt. Manifestó que cuando ésta dejó de trabajar en el 2016 ya Ramón tenía las maquinarias y no estaban en Hot Asphalt.

154. A pregunta de cuántos hermanos trabajaban ahí del 2008 al 2016, explicó que Ramón siempre estuvo, siempre estuvo ella, Héctor iba y venía. Remarcó que Héctor nunca estaba ahí como que fijo todo el tiempo como lo estuvo Ramón, y como estuvo ella. Afirmó que estuvo un tiempo trabajando Fabi, pero fue corto. Identificó a Fabi como su hermana por parte de padre.

155. Declaró que la relación de José Luis con Ramón entre el 2008 y el 2014 era super buena, ellos siempre estaban juntos, siempre compartían, se iban de fines de semana.

156. A preguntas en contrainterrogatorio, admitió que para el 19 de noviembre de 2016 se fue de vacaciones trabajando todavía en Hot Asphalt y al llegar de vacaciones no trabajó más en Hot Asphalt, a finales del 2016.

157. Confirmó que le consta que a principios del año 2016 había habido un altercado entre José Luis Torres Negrón y Ramón donde José Luis le estaba pidiendo que le devolviera los equipos y admitió saber que hay unos equipos que estaban inscritos en el DTOP y otros que no.

158. Con relación a la maquinaria que no está inscrita en el DTOP, no recuerda que se haya realizado un documento escrito de contrato donde José Luis le pasaba el paver a Ramón, y que de acuerdo con su conocimiento no recuerda si se hizo algún documento de donación de parte de Hot Asphalt a Ramón.

159. Afirmó que para el año 2014 los equipos se encontraban mal, estaban esbarataos, y en el 2015 también; en el 2016 no estaban en esas condiciones después que se los llevó Ramón, siendo el 2016 cuando Ramón se llevó la maquinaria que no estaba inscrita en DTOP y la que estaba inscrita en el DTOP a nombre de él, se la llevó toda. Admitió que esto causó un enfrentamiento entre José Luis y Ramón.

160. Admitió que antes de Ramón irse de Hot Asphalt, antes del 2016, éste hacía chiripitas trabajando en Hot Asphalt, los equipos estaban en las facilidades de Hot Asphalt, Ramón se llevaba los equipos, los usaba y los traía a las facilidades de Hot Asphalt. Aceptó que Ramón usaba y devolvía la maquinaria que no estaba inscrita en el DTOP, así como los que están inscritos en el DTOP a nombre de él.

161. Admitió tener conocimiento de que mientras Ramón trabajaba en Hot Asphalt, él tenía aspiraciones de montar su propio negocio, tener su propia compañía, pero que no necesariamente tenía planeado el negocio desde que estaba en Hot Asphalt.

162. Declaró que los equipos se reparaban por los mecánicos de Hot Asphalt y ya estaban inscritos a nombre de Ramón Torres.

163. Negó haber redactado las Resoluciones Corporativas para los traspasos, ella sólo los firmaba. No recuerda exactamente quienes las redactaban, afirmó que para ese tiempo estaba Trini y otra secretaria que no recuerda bien. Negó que en algún momento Trini le haya pedido que trajera unos expedientes que habían salido de Hot Asphalt con relación a los traspasos.

164. Afirmó que las Resoluciones Corporativas están en Hot Asphalt, que siempre permanecieron en Hot Asphalt, así como los títulos de propiedad de los camiones transferidos. Expresó que hay un expediente de las Resoluciones, se firma, se lleva a cabo y se guarda copia en expediente y los títulos de propiedad se archivaban donde tenía que corresponderse.

165. Informó que una vez que se hace el traspaso, el documento se lo lleva Ramón porque ya se hizo el traspaso y todas las Resoluciones se guardan donde tienen que ir para evidenciar lo que se autorizó y tiene que haber una copia en el expediente; se hace, ella lo firma, lo firma José Luis y se guarda en el expediente, por ende, tiene que estar ahí. Aceptó que todos esos títulos estuvieron en Hot Asphalt en la oficina y posteriormente no estuvieron, cada expediente tiene su lugar, no era un file, eran

varios y dependiendo de los equipos se acomodaba la información.

166. Manifestó que le consta que Ramón tomó esos títulos y se los lleva cuando eran de él.

167. Aceptó que los vehículos había que inspeccionarlos cada determinado tiempo para sacar marbete y demás. Negó que Hot Asphalt siempre pagara por las inspecciones de los vehículos. Explicó que: "Es que muchas veces venía, por ejemplo, por decir usted y venía y lo pagaba. Pagaba la inspección. Porque eso se daba a cada rato. Usted venía pagaba la inspección. Entonces, si te daban el reembolso, porque tú podías llevar los tickets a la oficina y si te daban el reembolso te lo dan y sino pues lo pagaste y ya, perdiste los chavos." Aclaró que pasaba que un cliente pagara la inspección, después traían el recibo de la evidencia de lo que se pagó, aunque la persona no tuviera relación alguna con los camiones; y en muchas ocasiones, Hot Asphalt lo pagaba.

168. Testificó desconocer qué camión quedó a nombre de Hot Asphalt luego de que se transfieren todos los camiones a Ramón.

169. Afirmó que todos los camiones de Ramón los pagaba él, de su sueldo, desde el año 2009 hasta el 2014. Entiende que los seguros que envolvían esos equipos no los pagaba Ramón, los pagaba Hot Asphalt, a pesar de que no era el dueño. Negó que, si había que cambiar gomas, y frenos todo lo pagara Hot Asphalt, algunos sí, inclusive algunos de Ramón. Negó que cuando había que cambiar frenos se buscara si estaba a nombre de Ramón o que Ramón fuera a la oficina a pagarlos.

170. Reconoció que se hacía descuentos del pago de nómina de Ramón, y suspensión de nómina también, sin ningún motivo injustamente Hot Asphalt suspendía los pagos de nómina, lo que afectaba a Ramón. Afirmó que esto pasó toda la vida que Ramón ha estado con José Luis, a pesar de la angustia de Ramón y que eso le causaba mucho daño a Ramón, la relación de José Luis era excelente.

171. Aceptó que quien controlaba los pagos de Ramón era José Luis.

**Testimonio del demandado, Ramón Torres Rivera**

172. A preguntas en interrogatorio realizadas por su representante legal, expresó que su nombre completo es Ramón Torres Rivera.

173. Declaró que a pesar de no recordar la fecha exacta en que comenzó a trabajar en Hot Asphalt fue aproximadamente como pal 1990, a la edad de 18 o 19 años. Comentó que para el 1990 realizaba en Hot Asphalt la función de obrero y para esa fecha Hot Asphalt se dedicaba a una compañía de construcción: de carreteras, estacionamientos, tirando asfalto. Como obrero hacía las funciones de palero: "te coges el asfalto lo tiras p'aquí y limpias, todo es con la pala".

174. Admitió haber trabajado continuamente en Hot Asphalt hasta el 2000 por ahí. Después del 2000 trabajó en Eco Eléctrica

en Guayanilla. Luego de Eco Eléctrica, como en el 2000 regresa nuevamente a Hot Asphalt, no sabe la fecha correctamente.

175. Expresó que para el 2008 era operador de equipo pesado en Hot Asphalt, operando rolos y paver. Mencionó que el paver es el que tira el asfalto. Posterior a eso, ocupó la posición de supervisor de brigada, inspeccionando el trabajo que se hace.

176. Manifestó que en el presente se dedica a la pavimentación de carreteras bajo contrato con municipios, mediante subastas.

177. Declaró tener una sola fuente de ingresos por su cuenta como contratista.

178. Testificó que RT Asphalt es una corporación con la que trabaja, siendo RT Asphalt quien cotiza con los municipios, siendo él empleado de RT Asphalt. Hace funciones en RT Asphalt, si mal no recuerda desde el 2016, antes del 2016 trabajaba con Hot Asphalt. Indicó que Hot Asphalt era de José Luis Torres. Entiende que en su mejor recuerdo cesó operaciones en Hot Asphalt para el 2015.

179. Expresó que para el 2015 sus fuentes de ingresos provenían de trabajos independientes que hacía regado y compactado de asfalto, lo que está haciendo actualmente.

180. Sobre el regado y compactado de asfalto, afirmó que compra asfalto en diferentes plantas, en diferentes suplidores, ellos le dan crédito, le despachan el asfalto y luego llegan al proyecto y hace el regao y compactao, lo que se le llama el regao y el compactao en el proyecto.

181. Aceptó que él cotiza un tramo de una carretera, busca el mejor precio en diferentes plantas. Explicó que el proceso es el siguiente: "llegan camiones al proyecto y el camión lo deposita en la máquina, se opera la máquina, luego la máquina lo riega y el rolo lo compacta"; él simplemente deja el asfalto tirado y cesan sus operaciones.

182. Sobre los equipos que utiliza para realizar el proceso, indicó que utiliza paver, rolo y escoba para barrer la carretera y primer también.

183. A preguntas sobre de qué trata el caso, señaló que trata del pleito legal que tiene con Hot Asphalt, que hay unos vehículos de motor inscritos en el DTOP que Hot Asphalt lo reclama.

184. Declaró que los vehículos pasaron a su nombre porque el Sr. José Luis Torres los pasa a su nombre por su voluntad, porque los quiso ceder a nombre de él.

185. Sobre los otros equipos para aplicar asfalto reclamados en la Demanda indicó poseer varios equipos. Relacionados a la Demanda tiene en su posición los siguientes equipos: un Paver PF3200, una Leeboy 8500, un rolo Dynapac CC122, un Bomag WD177, un Duopact 1500, un rolo Duopact 1500, un tractor Newholland 3010, un camión primer aceite Western Star, un Kenworth WT800 color rojo, una plataforma 35 toneladas, cuya

marca no recuerda; básicamente esos son los equipos para trabajar la pavimentación del asfalto.

186. Manifestó que advino en posesión de esos equipos para el 2010 o antes, porque el Sr. José Luis Torres se los cedió para trabajar. Indicó que desde el 2010 usaba los equipos para trabajar en repavimentación de estacionamiento.

187. Declaró que José Luis Torres es su papá. Mencionó que para el 2010 la relación con su papá estaba estable, porque después surgieron varios problemas.

188. Expresó que al día de hoy los vehículos están en sus facilidades, en buenas condiciones y son utilizados para trabajo.

189. Trabajó para su papá aproximadamente para el 2016 porque hubo diferencias entre él y su papá porque éste le estaba reclamando el equipo. Después de esa diferencia, el testigo tiene el equipo. Antes de 2016, expresó que ese equipo estaba en las facilidades de Hot Asphalt, aproximadamente desde el 2016 ese equipo se encuentra en sus facilidades.

190. Indicó que su papá le solicitó los equipos en el 2016 porque los quería de regreso, él entiende que como se rompió la relación, su papá los quería para atrás. Respondió que desde 2010 al 2016 hay 6 años.

191. A preguntas en contrainterrogatorio, reiteró que comenzó a trabajar en Hot Asphalt cuando tenía como 18 años, siendo esta una compañía cuyo presidente siempre fue José Luis Torres Negrón.

192. Admitió haber constatado el crecimiento de la compañía por contratos en algún momento grandísimos, desde que él ha podido saber, así como que tuvo muchos camiones y equipos de instalar brea, rolos, escobas.

193. Aceptó haber sido tesorero en Hot Asphalt, pero que desconocía las condiciones económicas de la empresa. Expresó que no necesariamente los contratos con el gobierno se tardaban mucho en pagar, en aquel momento no sabía que pagaban a tiempo.

194. No recuerda que después del año 2008 el asunto de la construcción y los desarrollos en Puerto Rico comenzó a mermar.

195. Aceptó que la relación entre él y su padre, mientras éste trabajaba en Hot Asphalt no era de contarse sus cosas personales, era una relación estrictamente de trabajo.

196. Reconoció que hay dos clases de equipo, los equipos que tiene que ver con instalación de brea, que son los que no están inscritos en el DTOP y los que están inscritos en el DTOP son los camiones, vehículos.

197. Mostrada la Demanda de 2020, en el párrafo número 3, verificó que esos son los equipos que no están inscritos en el DTOP. Revisado el párrafo número 4, asintió que son los equipos inscritos en el DTOP. Admitió conocer los equipos del párrafo número 3, los cuales eran los de Hot Asphalt. Reconoció los

equipos del párrafo número 4, los cuales antes eran de Hot Asphalt y ahora son suyos, tanto los del párrafo 3 y 4.

198. Aceptó no haber firmado con Hot Asphalt ningún documento de donación, respecto a los hechos anteriores, ni respecto a los equipos en el párrafo número 3 y 4 de la Demanda. Sobre si es incorrecto que los equipos llegaron a él por medio de donación, declaró no saber.

199. Admitió haber progresado dentro de Hot Asphalt, llegó desde obrero a supervisor y tesorero, pero que estaba en su mente tener lo suyo, su propio negocio, lo que quiso desde joven. Aceptó que mientras trabajaba en Hot Asphalt sin ocultarle nada a su papá, lo que quería era tener su propio negocio. Indicó que mientras trabajó en Hot Asphalt no tenía ninguna corporación inscrita, ni tenía negocio no inscrito. Trabajó en Hot Asphalt hasta el día en que tuvo el altercado con su papá, y admitió que posterior al altercado regresó en una fecha distinta a Hot Asphalt y se llevó los equipos.

200. Reconoció que hizo traspasos con su papá entre el 2009 y el 2013 o 2014, por ahí y que todos esos equipos permanecieron en Hot Asphalt hasta que se los llevó. Aceptó que no hay ningún documento en que Hot Asphalt le traspasa los equipos del párrafo número 3 de la Demanda que son los no inscritos en el DTOP. Tampoco pagó ni un centavo por esos equipos.

201. Admitió que Hot Asphalt tenía sus propios mecánicos, les daba mantenimiento a esos equipos, pagaba por los mantenimientos y los arreglos de esos equipos.

202. Reconoció que Hot Asphalt utilizaba los equipos para los trabajos que tuviera hasta el 2014, 2015 y 2016, o sea, el proyecto que apareciera Hot Asphalt lo hacía y usaba esos equipos y Hot Asphalt no le pedía permiso ni le pagaba por usar esos equipos.

203. Declaró conocer lo que era Salinas Asphalt, Hot Asphalt y conocer a José Luis Torres Negrón en su carácter personal, conoce lo que es Peñuelas Agregados y Salinas Agregados, algo así, y que estas corporaciones eran propiedad de José Luis Torres Negrón.

204. Testificó conocer que hubo un problema económico en el cual estuvo envuelto José Luis Torres Negrón en su carácter personal y Hot Asphalt, que su papá perdió hasta la casa de vivienda, hecho que aceptó haber declarado en la deposición.

205. Mostrado el Exhibit 4 por estipulación, página 6 al 9, confirmó que la residencia que su papá perdió era en Mansión Real en Ponce por entregar en dación en pago al banco. Negó conocer sobre la demanda que había.

206. Declaró conocer que los trabajos en Hot Asphalt del 2010 en adelante habían aflojado, mermado y la situación económica se estaba poniendo difícil para pagar los gastos incluyendo la nómina. Afirmó no recordar si del año 2009 hasta el año 2016 éste hizo estado financiero en que incluyera esos equipos.

207. Informó que en Hot Asphalt se ganaba $400.00 o $500.00 semanal. Aceptó tener gastos como padre de familia y que era duro con $400.00 o $500.00 semanales solamente y que no le daba para los gastos de camiones, ni renovaciones de marbetes, ni daba para seguros de vehículos.

208. Admitió que más o menos a principios del año 2016, Don José Luis lo abordó y le dijo que le devolviera los traspasos de los vehículos, que se hicieran los traspasos nuevamente para atrás para Hot Asphalt de manera que los equipos pasaran nuevamente a nombre de Hot Asphalt, pero ya la relación entre éste y su papá no estaba muy buena. Admitió que la realidad es que los equipos estaban a su nombre y no los iba a pasar a nombre de su papá. Declaró que sólo algunos equipos permanecían en las facilidades de Hot Asphalt.

209. Testificó que él hacía un trabajo con los equipos y le daba del dinero cuando hacía los trabajos a José Luis. Indicó que el equipo estaba en Hot Asphalt, él iba utilizaba ese equipo, lo devolvía a Hot Asphalt y le daba dinero a José Luis, quien era presidente de la corporación; pero cuando Hot Asphalt usaba los equipos no le daba ningún dinero al testigo.

210. Informó que RT Asphalt es una corporación de su propiedad, que éste hizo en el 2016, posterior a irse de Hot Asphalt, con posterioridad a llevarse los equipos de las facilidades de Hot Asphalt.

211. Negó que los documentos de traspasos se hayan extraviado; posterior al altercado él se los llevó de Hot Asphalt. Aceptó que después de llevarse los equipos no le dan autorización para que entre a las facilidades de Hot Asphalt, por lo que nunca más pudo entrar a Hot Asphalt.

212. Declaró que le tomó por sorpresa cuando José Luis le pidió los equipos de vuelta porque no esperaba que sus funciones en Hot Asphalt cesaran, porque esperaba convertirse en un funcionario importante en Hot Asphalt, tal vez cuando su papá faltara se convirtiera en presidente de Hot Asphalt. No había en su mente la creación de ningún otro negocio que no fuera Hot Asphalt, ni tenía razón para tener otro negocio.

213. Aceptó que no tenía empleados y haber declarado antes que su pensamiento era tener su propio negocio y ahora declara que no tenía en mente crear ningún negocio, a lo que reconoció finalmente que eso fue lo que declaró en la deposición.

214. Sobre por qué no le traspasó los equipos nuevamente a Hot Asphalt cuando su papá le indica que tiene que pasar los equipos para atrás, declaró que porque estaban a nombre de él.

215. A solicitud del demandante el Tribunal tomó conocimiento judicial sobre la Sentencia por estipulación del caso G4CI201400207, notificada el 14 de diciembre de 2015.

216. Aceptó que José Luis, a principios de 2016, le indicó que había resuelto los problemas económicos y que le pasara los equipos para atrás conforme se había acordado y que José Luis se molestó.

217. Reconoció que, a pesar de no tener ningún negocio en la mente, se negó a traspasarle los equipos a Hot Asphalt después de haber concluido con sus problemas económicos y se negó porque también estaba molesto con Don José Luis, por la forma en que lo abordó, no por lo que no habían acordado. Negó que hubiera acordado la devolución de los equipos.

218. Admitió que cuando José Luis le dijo que devolviera los equipos porque ya se habían resuelto los problemas económicos de Hot Asphalt, entonces él optó por sacar los equipos de Hot Asphalt, los que estaban registrados a su nombre.

219. Con relación a los equipos de asfalto, reconoció que ninguno estaba a su nombre, sin embargo, se los llevó. Testificó que entiende que en las facilidades de Hot Asphalt hay camiones que están a su nombre, pero que no se los llevó, ni ha reclamado llevárselos, pero negó haberse llevado sólo los que estaban en mejor condición, no se llevó los que estaban dañados. Admitió que con esos equipos que eran de Hot Asphalt, los que estaban registrados a su nombre y los que no estaban registrados a su nombre, después de acondicionarlos montó su compañía y continuó trabajando. Aceptó no tener título de propiedad, ni documento de traspaso, compraventa o donación, ni resolución corporativa, ni ningún otro documento sobre los equipos no registrados, simplemente los cogió y se los llevó porque José Luis se los había dado verbalmente. Declaró que esos equipos permanecieron en Hot Asphalt hasta que se los llevó.

220. Manifestó afirmativamente que el propósito de ese traspaso que como no tenía una idea de negocio, no era específicamente para que él comenzara un negocio. Expresó que como iba creciendo en Hot Asphalt quería quedarse allí y en ningún momento, antes del altercado que tuvo con Don José Luis Torres Negrón en el 2016, cuando le pidió los equipos, Don José no le había dicho que se tenía que ir de ahí de la corporación. Negó recordar si en algún momento José Luis en representación de Hot Asphalt le dijo a él que ya era tiempo de que el testigo hiciera su propio negocio, entendió que no.

221. A preguntas en redirecto, sobre el porqué los equipos de pavimentación pasaron a nombre suyo, manifestó que José Luis se los dio verbalmente como para el 2010, por ahí.

222. Testificó que para poder mantener su familia lo que hacía era trabajar en Hot Asphalt.

223. Mencionó que desde el 2010 al 2016 usaba los equipos de asfalto para hacer trabajos independientes, trabajos privados, como José Luis le había dado el equipo, pues él hacía sus cositas aparte, de lo que hacía le daba dinero a José Luis.

224. Declaró que José Luis le entregó los equipos para que pudiera seguir trabajando.

225. A preguntas en recontrainterrogatorio, explicó que al usar los equipos de asfalto le entregaba personalmente a José Luis un dinero, varias veces entregado en las facilidades de Hot Asphalt por la utilización de equipo y el equipo permanecía guardado en Hot Asphalt.

226. A preguntas del Tribunal, sobre por qué no tenía conocimiento sobre los asuntos económicos de la corporación a pesar de haber respondido a preguntas de los abogados que éste era Tesorero de la corporación, declaró que su papá lo puso en la posición de tesorero para ser parte de lo que le llaman la Junta de la Corporación, pero no tomaba decisiones administrativas, no sabía nada, ni tenía conocimiento. Afirmó que en ocasiones Yolanda que era la contable le daba documentos para firmar, pero que él realmente no sabía, era bien jovencito también, firmaba y ya pero no tenía conocimiento.

227. A preguntas en recontrainterrogatorio, reiteró que su papá en calidad de presidente de Hot Asphalt lo designó como Tesorero para que fuera parte de la Corporación y este era el deseo del testigo, pertenecer a la corporación y que a veces también firmaba documentos relacionados a su plaza de tesorero. (Énfasis nuestro).

Con base en estas determinaciones de hechos, el TPI concluyó que entre las partes no hubo donación de los equipos, sino una simulación. Además, precisó que la parte apelada no cumplió con el plazo para adquirir los equipos por prescripción. Asimismo, el foro primario dispuso que entre las partes se materializó un contrato simulado, con causa ilícita en fraude de acreedores.

Con relación al testimonio del señor José Luis Torres Negrón, el TPI determinó que el móvil del acuerdo de traspasar los equipos a título gratuito al señor Torres Rivera se debió a la situación económica de la parte apelante y para evitar el embargo por parte de los acreedores. Por lo anterior, el foro primario resolvió que el negocio jurídico tenía una causa torpe o ilícita, atribuible a ambas partes, por lo que estas estaban impedidas de reclamarse recíprocamente por mandato de ley.

Inconforme con la *Sentencia,* el 26 de diciembre de 2024, la parte apelante presentó una *Moción de Reconsideración*[11] en la que adujo que, conforme a las determinaciones de hecho que hizo el tribunal relacionadas a que no hubo acuerdo sobre los equipos que no estaban inscritos, entonces, estos debían ser entregados al apelante. En cuanto a los equipos que sí

---

[11] Entrada Núm. 148 del SUMAC del TPI.

estaban inscritos en el DTOP, reiteró que el traspaso se hizo para proteger la marcha del negocio y que no hubo acuerdo en fraude de acreedores.

El 26 de enero de 2025, el señor Torres Rivera presentó su *Moción en Oposición a Reconsideración*[12]. Mediante *Resolución*[13] emitida el 31 de enero de 2025, el TPI declaró No Ha Lugar la reconsideración.

Así las cosas, el 4 de marzo de 2025, la parte apelante acudió ante este Tribunal mediante el presente recurso de *Apelación Civil*[14], presentado como *certiorari*, acogido como apelación. En su escrito apelativo señaló los siguientes errores:

> **ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL RESOLVER QUE EL ACUERDO ENTRE LA PARTE APELANTE Y EL APELADO TENÍA UNA CAUSA TORPE, Y POR ENDE LA PRIMERA NO PODÍA SOLICITAR RESTITUCIÓN ALGUNA CONTRA LA SEGUNDA, PERO SIMULTÁNEAMENTE CONCLUIR QUE EL CONTRATO ADOLECÍA DE SIMULACIÓN ABSOLUTA.**
>
> **ERRÓ EL TPI AL CONCLUIR QUE MEDIÓ FRAUDE DE ACREEDORES COMO MOVIL DEL NEGOCIO JURÍDICO A PESAR DE QUE LA INTENCIÓN DE LA PARTE APELANTE FUE PAGAR A SUS ACREEDORES, COMO EN EFECTO OCURRIÓ; Y CUANDO NO SE DESFILÓ PRUEBA ALGUNA DE QUE SE HUBIESE DEFRAUDADO A LOS ACREEDORES DE LA PARTE APELANTE.**
>
> **ERRÓ EL HONORABLE FORO DE INSTANCIA AL APRECIAR LA PRUEBA TESTIFICAL Y DOCUMENTAL Y RESOLVER QUE LA CAUSA DEL NEGOCIO JURÍDICO ERA TORPE, PUES RESULTÓ EN FRAUDE DE ACREEDORES.**
>
> **ERRÓ EL HONORABLE FORO DE INSTANCIA AL DESESTIMAR LA ACCIÓN REIVINDICATORIA DE LA PARTE APELANTE EN CONTRA DE LA PARTE APELADA SOBRE UN GRUPO DE BIENES MUEBLES QUE NO FUERON PARTE DEL ACUERDO INVALIDADO Y QUE EL APELADO SE APROPIÓ Y NO TENÍA JUSTIFICACIÓN POSESORIA Y DOMINICAL SOBRE ELLOS.**

En la misma fecha, la parte apelante solicitó un término para presentar la transcripción de la prueba oral y posteriormente presentar su alegato suplementario.

---

[12] Entrada Núm. 154 del SUMAC del TPI.
[13] Entrada Núm. 155 del SUMAC del TPI.
[14] El 15 de abril de 2025, este Tribunal emitió una *Resolución* en la cual se indicó que el recurso, que se presentó como *certiorari*, se acogía como apelación, conservando la misma designación alfanumérica.

El 2 de junio de 2025, estando pendiente la presentación de la transcripción prueba oral y del alegato suplementario, la representación legal del señor Torres Rivera presentó una *Moción Informativa* en la que notificó a este Tribunal el fallecimiento de su representado y solicitó un término para poder realizar la correspondiente sustitución de partes. El 3 de junio de 2025, emitimos *Resolución* concediéndole treinta (30) días para solicitar la sustitución.

A su vez, el 6 de junio de 2025, la parte apelante presentó una *Moción Informativa y Anunciando la Sustitución de Parte*, en la que, además de notificar el fallecimiento del señor Torres Rivera, solicitó que este Tribunal le confiriera autoridad al TPI para expedir los emplazamientos para las partes que sustituirían al fallecido. Tras darle oportunidad a la parte apelada para que expresara su posición respecto a la solicitud de la parte apelante y sin que estos comparecieran, el 2 de julio de 2025 emitimos una *Resolución* en la que autorizamos a la parte apelante a solicitar la sustitución de parte y a notificarnos cuando los emplazamientos fueran diligenciados.

Luego de varios incidentes procesales, mediante *Resolución* del 19 de septiembre de 2025, tomamos conocimiento judicial de que los emplazamientos fueron expedidos.

El 6 de noviembre de 2025, la parte apelante presentó la transcripción de la prueba oral y, mediante *Resolución* del 13 de noviembre de 2025, concedimos un término de veinte (20) días a la parte apelada para presentar sus objeciones a la transcripción. No obstante, la parte apelada no presentó sus objeciones en el término provisto, por lo cual, el 12 de diciembre de 2025, emitimos una *Resolución* mediante la cual se acogió la transcripción presentada y se le dio a la parte apelante hasta el 12 de enero de 2026 para presentar su alegato suplementario.

El 3 de febrero de 2026, la parte apelante presentó su *Alegato Suplementario* y, el 5 de marzo de 2026, la parte apelada presentó su *Oposición a Recurso de Apelación.*

En su oposición, la parte apelada señaló que no incidió el foro primario al concluir que el negocio entre las partes tuvo una causa ilícita o torpe, ya que del propio récord surge que los traspasos se realizaron para evitar el riesgo de embargo y permitir las operaciones del negocio de la parte apelante. En cuanto a la denegatoria de la acción reivindicatoria sobre los bienes no inscritos, sostienen que la parte apelante no probó su titularidad sobre tales bienes ni los identificó con la especificidad requerida para tal acción.

En el mismo escrito, la parte apelada solicitó la desestimación del recurso por falta de jurisdicción. Señaló que la copia del escrito de apelación que se le notificó al TPI no estaba debidamente sellada por la Secretaria de este Tribunal de Apelaciones, lo cual era contrario a lo que dispone la Regla 14(B) del Reglamento del Tribunal de Apelaciones y motivo para desestimar el recurso.

En cuanto a la solicitud de desestimación instada por la parte apelada, la misma se ***deniega***.

Con el beneficio de la comparecencia de ambas partes, así como la transcripción de la prueba oral, disponemos a resolver el recurso que nos ocupa.

## II.

### A. Deferencia judicial

Es norma conocida que, ante la ausencia de error manifiesto, prejuicio, parcialidad o pasión, "no se favorece la intervención de los tribunales apelativos en la apreciación de la prueba, la adjudicación de credibilidad o las determinaciones de hechos formuladas por el Tribunal de Primera Instancia." Regla 42.2 de Procedimiento Civil, 32 LPRA Ap. V, R. 42.2; *Peña Rivera v. Pacheco Caraballo,* 213 DPR 1009, 1024 (2024); *Ortiz Ortiz v.*

*Medtronic,* 209 DPR 759, 778 (2022); *Santiago Ortiz v. Real Legacy et al.*, 206 DPR 194, 219 (2021).

En ese contexto, la llamada deferencia judicial está predicada en que los jueces del TPI "están en mejor posición para aquilatar la prueba testifical porque tienen la oportunidad de oír, ver y apreciar el comportamiento del testigo". *Peña Rivera v. Pacheco Caraballo, supra,* pág. 1025, citando a *Ortiz Ortiz v. Medtronic, supra,* pág. 779. No obstante, si la apreciación de la prueba no representa el balance más racional, justiciero y jurídico de la totalidad de la prueba y cuando la evaluación se distancie de la realidad fáctica o esta es inherentemente imposible o increíble, los foros apelativos tenemos la responsabilidad ineludible de intervenir. *Santiago Ortiz v. Real Legacy et al.*, *supra*; *González Hernández v. González Hernández,* 181 DPR 746, 776–777 (2011); *Pueblo v. Santiago et al.*, 176 DPR 133, 148 (2009).

Por otro lado, cuando las conclusiones de hechos se fundamentan en prueba documental o pericial, es norma establecida que el tribunal revisor se encuentra en igual posición que el tribunal sentenciador para evaluarla. *Santiago Ortiz v. Real Legacy et al., supra.* En consecuencia, "el Tribunal Apelativo tendrá la facultad para adoptar su propio criterio en la apreciación y evaluación de la prueba pericial, y hasta para descartarla, aunque resulte técnicamente correcta". *González Hernández v. González Hernández, supra*, pág. 777.

### B. Teoría general de los contratos

Nuestro sistema jurídico reconoce el principio de la autonomía de la voluntad y libertad de contratación, lo que permite a los contratantes fijar los pactos, condiciones y cláusulas que estimen convenientes, siempre que no contravengan la ley, la moral o el orden público. Art. 1207 del Código Civil de Puerto Rico de 1930[15], 31 LPRA sec. 3372; *BPPR v. Sucn. Talavera*, 174 DPR

---

[15] A pesar de que el Código Civil de Puerto Rico de 1930 fue derogado por el Código Civil de Puerto Rico de 2020, aprobado mediante la Ley Núm. 55 de 1 de junio de 2020, 31 LPRA sec.

686, 693 (2008). Asimismo, siempre que concurran los elementos esenciales para su validez, los contratos pueden celebrarse en cualquier forma, incluso verbalmente, y serán obligatorios. Art. 1230 del Código Civil de Puerto Rico, 31 LPRA sec. 3451; *VELCO v. Industrial Serv. Apparel*, 143 DPR 243, 250 (1997).

El contrato existe desde que una o varias personas consienten en obligarse frente a otra u otras a entregar una cosa o prestar un servicio. Art. 1206 del Código Civil de Puerto Rico, 31 LPRA sec. 3372. Para que exista un contrato válido deben concurrir tres elementos esenciales: el consentimiento de las partes, un objeto cierto que pueda ser materia del contrato y la causa de la obligación. Art. 1213 del Código Civil de Puerto Rico, 31 LPRA sec. 3391. El consentimiento se manifiesta por el concurso de la oferta y de la aceptación sobre la cosa y la causa que han de constituir el contrato. Art. 1214 del Código Civil de Puerto Rico, 31 LPRA sec. 3401.

### C. Causa ilícita y contratos con causa torpe

En lo concerniente a la causa de la obligación, esta varía conforme a la naturaleza del contrato. En los contratos onerosos, la causa consiste en la prestación o promesa de una cosa o servicio; en los contratos remuneratorios, corresponde al servicio o beneficio que se remunera; mientras que en los contratos de pura beneficencia la causa radica en la mera liberalidad del otorgante. Artículo 1226 del Código Civil de 1930, 31 LPRA sec. 3431. Asimismo, en nuestro ordenamiento se presume que la causa del contrato existe y es lícita, aunque no esté expresada en el contrato. Artículo 1229 del Código Civil, 31 LPRA sec. 3434.

Por su parte, el Artículo 1227 del Código Civil de 1930, 31 PARA sec. 3432, dispone que "[l]os contratos sin causa, o con causa ilícita, no producen

---

5311 *et seq.*, según enmendado, para fines de este caso haremos referencia únicamente al Código Civil derogado por ser la ley vigente y aplicable a la controversia que nos ocupa.

efecto alguno. Es ilícita la causa cuando se opone a las leyes o a la moral." *Piovanetti v. SLG Touma, SLG Tirado*, 178 DPR 745, 773 (2010).

A su vez, en nuestro ordenamiento, el derecho contractual descansa sobre la premisa fundamental de que no puede existir contrato sin causa, ni tampoco cuando esta es ilícita. *Col. Int'l Sek PR, Inc. v. Escriba*, 135 DPR 647, 664 (1994); *Sánchez Rodríguez v. López Jiménez*, 116 DPR 172, 181 (1985). En ese sentido, la causa es ilícita cuando contraviene las leyes o la moral, lo cual supone "una lesión a un interés general de carácter jurídico o moral." *Sánchez Rodríguez v. López Jiménez, supra*, pág. 182.

La doctrina reconoce dos modalidades de causa ilícita: la causa ilegal, cuando es contraria a las leyes, y la causa inmoral o "causa torpe", cuando se opone a la moral o a las buenas costumbres. *Col. Int'l Sek PR, Inc. v. Escriba, supra*, pág. 665; *Dennis, Metro Invs. v. City Fed. Savs.*, 121 DPR 197, 217 (1988); véase también L. Diez-Picazo, Vol. I, *Fundamentos del Derecho Civil Patrimonial*, Madrid, Tecnos, 1979, pág. 168. La causa será ilícita no solo cuando el contrato en sí mismo esté expresamente prohibido, sino también cuando, por ejemplo, se realizan contratos en fraude de los derechos de un tercero, en daño a un tercero, o en fraude de acreedores o herederos. *Rosario Rosado v. Pagán Santiago*, 196 DPR 180, 191 (2016); *Dennis, Metro Invs. v. City Fed. Savs., supra*, págs. 216–217; *Sánchez Rodríguez v. López Jiménez, supra*, págs. 185–186.

### D. Contrato simulado

Por otro lado, aunque la existencia de una causa constituye un requisito esencial para la validez de los contratos, ello no impide que se reconozca eficacia jurídica a un contrato en el que se haya expresado una causa falsa, entendida como una causa fingida o que encubre una verdadera. *Delgado Rodríguez v. Rivera Siverio*, 173 DPR 150, 161 (2008). En tal sentido, el Artículo 1228 del Código Civil de 1930, 31 LPRA sec. 3433, dispone que "[l]a expresión de una causa falsa en los contratos dará lugar a la nulidad, si

no se probase que estaban fundados en otra verdadera y lícita." Así, se ha reconocido la validez de los contratos simulados que expresan una causa falsa siempre que se pruebe que el negocio encubre una causa verdadera y lícita. *Delgado Rodríguez v. Rivera Siverio, supra,* pág. 161; *Reyes v. Jusino,* 116 DPR 275, 284 (1985).

La simulación ha sido definida como "el acto o negocio jurídico que por acuerdo de las partes se celebra exteriorizando una declaración recepticia no verdadera para engañar a terceros, sea que éste carezca de todo contenido, o bien que esconda uno verdadero diferente al declarado." *Díaz García v. Aponte Aponte,* 125 DPR 1, 8 (1989).

Nuestro Tribunal Supremo ha reconocido dos modalidades de simulación contractual: la absoluta y la relativa. La simulación absoluta ocurre cuando las partes crean la apariencia de un negocio jurídico sin intención de producir efecto alguno, de modo que el acto es meramente ficticio. *Delgado Rodríguez v. Rivera Siverio, supra,* citando a *Díaz García v. Aponte Aponte, supra,* pág. 10. En estos casos "se pretende la configuración aparente de un acto ficticio o inexistente", por lo que el negocio carece de causa y resulta nulo, inexistente y sin efectos jurídicos. *Díaz García v. Aponte Aponte, supra*; *Hernández Usera v. Srio. de Hacienda,* 86 DPR 13, 18 (1962).

Por su parte, la simulación relativa se produce cuando las partes aparentan celebrar un negocio jurídico, pero en realidad desean y ejecutan uno distinto, cuya verdadera naturaleza permanece oculta. *Delgado Rodríguez v. Rivera Siverio, supra,* pág. 162. En tales circunstancias, el negocio aparente se utiliza para encubrir el negocio verdaderamente deseado por las partes. *Id.* Una vez se acreditan los requisitos correspondientes, el contrato simulado pierde eficacia y prevalece el negocio jurídico real que las partes pretendieron celebrar. *Díaz García v. Aponte Aponte, supra.*

**E. Efectos de la nulidad de contratos con causa ilícita o causa torpe**

Como se ha señalado, los contratos cuya causa sea falsa o ilícita carecen de eficacia jurídica, pues la causa constituye uno de los elementos esenciales para la validez de un contrato. Art. 1227 del Código Civil, *supra*. En consecuencia, una vez se determina que la causa es ilícita, el contrato resulta nulo e inexistente. *Piovanetti v. SLG Touma, SLG Tirado, supra*, pág. 773.

Con ese propósito, el Artículo 1255 del Código Civil, 31 LPRA sec. 3514, dispone que la declaración de nulidad de un contrato tiene como consecuencia deshacer el intercambio de prestaciones practicadas y evitar que las obligaciones contraídas y no cumplidas puedan ser exigidas.

No obstante, esta norma general de restitución recíproca admite excepciones. En particular, cuando ambas partes conocen la ilicitud de la causa del contrato, ninguna de ellas puede exigir la restitución de lo entregado ni reclamar el cumplimiento de lo prometido por la otra. Art. 1258 del Código Civil, 31 LPRA sec. 3517; *Rubio Sacarello v. Roig*, 84 DPR 344, 350-352 (1962). En tales circunstancias, los contratantes carecen "de toda acción entre sí, [lo que] implica que ninguno de los contratantes puede reclamar del otro el cumplimiento si aún no había verificado, sin que esto último, que es una penalidad civil para uno y otro contratante, suponga generalmente la sanción del aprovechamiento por ninguno, de lo que hubiese recibido...". J.M. Manresa, *Comentarios al Código Civil Español*, 6ta ed. Madrid, Ed. Reus, 1967, Madrid, T. VIII, Vol. 2, pág. 879.

En síntesis, cuando ambas partes participan en la ilicitud del negocio jurídico, quedan impedidas de reclamarse recíprocamente. *Sánchez Rodríguez v. López Jiménez, supra*, pág. 183. Sobre este particular, el Tribunal Supremo ha expresado que:

> [D]eclarada la nulidad de un contrato las partes contratantes quedan condenadas a la restauración del estado primitivo anterior de las cosas, mediante la restitución de las prestaciones objeto del contrato, salvo cuando la nulidad se deba a causa

torpe o ilícita, y en cuyo caso prevalece como criterio el de culpa o torpeza atribuible a las partes. *Bosques v. Echevarría*, 162 DPR 830, 836-837 (2004).

Así, cuando ambas partes han participado en la causa ilícita del contrato, están impedidas de reclamarse recíprocamente.

### F. Fraude de acreedores

El Artículo 1242 del Código Civil, 31 LPRA sec. 3491, establece que los contratos válidamente celebrados pueden rescindirse en los casos establecidos por la ley. En particular, el Artículo 1243 del Código Civil, 31 LPRA sec. 3492, inciso (3), dispone que son rescindibles los contratos "celebrados en fraude de acreedores, cuando éstos no puedan de otro modo cobrar lo que se les deba". Según el Artículo 1249 del Código Civil, 31 LPRA sec. 3498, establece que "[s]e presumen celebrados en fraude de acreedores todos aquellos contratos por virtud de los cuales el deudor enajenare bienes a título gratuito." Dicha presunción admite prueba en contrario. *VELCO v. Industrial Serv. Apparel, supra*, pág. 254.

La acción de rescisión por fraude de acreedores, también conocida como acción pauliana, es un recurso subsidiario que no podrá ejercitarse excepto cuando el acreedor perjudicado no tenga otro medio de cobrar de su deudor lo que se le debe. Art. 1246 del Código Civil, 31 LPRA sec. 3495. Ahora bien, la acción pauliana difiere de la de nulidad radical o absoluta. *De Jesús Díaz v. Carrero*, 112 DPR 631, 641 (1982). En la primera, el deudor ha enajenado verdadera, pero fraudulentamente, mientras que en el segundo supuesto el deudor aparenta o simula realizar una enajenación, que no existe o es distinta de la verdaderamente realizada. *Id.*, págs. 641-642*.*

### G. La acción reivindicatoria de bienes muebles

El Artículo 280 del Código Civil de 1930, 31 LPRA sec. 1111, establece que el derecho de propiedad comprende las facultades de gozar, disponer y reclamar la cosa que constituye su objeto. En particular, la referida norma reconoce al propietario el derecho de ejercitar una acción contra quien tenga

o posea la cosa para reivindicarla. *Id.* Esta facultad se deriva del propio contenido del derecho de propiedad, el cual incluye la potestad del titular de excluir a terceros de cualquier interferencia con el uso, disfrute o disposición del bien. *Soc. Gananciales v. G. Padín Co., Inc.,* 117 DPR 94, 100-101 (1986); J. Puig Brutau, *Compendio de Derecho Civil,* Vol. III, Ed. Bosch, Barcelona, 1989, pág. 44.

La acción reivindicatoria constituye una de las acciones protectoras del dominio, mediante la cual el propietario de un bien que no se encuentra en su posesión puede reclamarlo de quien lo tenga o posea. *Ramírez Quiñones v. Soto Padilla,* 168 DPR 142, 157 (2006). Para que prospere una reclamación de esta naturaleza, el demandante debe acreditar: (1) su derecho de propiedad sobre el bien reclamado; (2) que la acción se dirige contra la persona que posee o detenta el bien; (3) que el demandado no cuenta con un derecho que justifique su posesión frente al propietario; y (4) que se identifique, de manera precisa y clara, la cosa que se reivindique. J. Puig Brutau, *op. cit.,* págs. 46-47; véase, además, *Ramírez Quiñones v. Soto Padilla, supra,* pág. 157; *Pérez Cruz v. Fernández,* 101 DPR 365, 374 (1973); *Arce v. Díaz,* 77 DPR 624, 628-629 (1954).

En cuanto al requisito de probar que la cosa es suya, el demandante está obligado a probar su título y no puede descansar únicamente en los vicios que tenga el título del demandado. *Ramírez Quiñones v. Soto Padilla, supra; Castrillo* v. *Maldonado,* 95 DPR 885, 891-892 (1968). Sobre el particular, el tratadista Puig Brutau señala que "[e]l demandante ha de probar que es el propietario de la cosa que reclama. La jurisprudencia ha puntualizado que no es indispensable presentar un título escrito de dominio y que basta la prueba por cualquier otro medio. […] La carga de la prueba del derecho del derecho de propiedad recae sobre el reivindicante." J. Puig Brutau, *op. cit.,* págs. 47-48. Así, una vez el demandante pruebe su título, le

corresponde al demandado señalar y probar su mejor título. *Ramírez Quiñones v. Soto Padilla, supra*; *Arce v. Díaz, supra.*

Por otro lado, si el poseedor ostenta algún título legítimo que justifique su posesión, aunque no sea propietario —por ejemplo, en calidad de usufructuario, arrendatario o en virtud de un contrato que autorice la tenencia del bien— la acción reivindicatoria pierde su razón de ser. C. Lasarte, *Propiedad y Derechos Reales de Goce: Principios de Derecho Civil IV*, Marcial Pons, Madrid, 2010, pág. 137. En consecuencia, para que la acción reivindicatoria prospere, la posesión del demandado debe carecer de un fundamento jurídico que la legitime frente al propietario.

Finalmente, cuando el demandado justifica su posesión mediante la invocación de un título dominical propio, corresponde al demandante solicitar la declaración de nulidad de dicho título si pretende prevalecer en su reclamación. *Amy et al. v. Amy et al.*, 15 DPR 415, 434 (1909); véase, además, C. Lasarte, *op. cit.*, pág. 137.

**III.**

En su recurso, la parte apelante plantea cuatro señalamientos de error. Por su estrecha relación, atenderemos conjuntamente los primeros tres.

La parte apelante sostiene que el TPI erró al concluir que el acuerdo entre las partes tenía una causa torpe y que, por ello, ninguna de ellas podía reclamar restitución. Aduce, además, que el foro primario actuó incorrectamente al concluir que el negocio jurídico era simulado y que su móvil constituyó un fraude de acreedores. No le asiste la razón.

Según surge de las determinaciones de hecho del foro primario, el propio señor José Luis Torres Negrón —presidente de Hot Asphalt— declaró que los traspasos de los equipos inscritos en el DTOP se realizaron debido a las dificultades económicas que enfrentaba la corporación y ante el riesgo de embargo por parte de sus acreedores. Conforme a ese testimonio, el acuerdo consistía en transferir los equipos a nombre del señor Torres Rivera para

evitar que estos fueran objeto de embargo mientras se resolvía la situación con las instituciones financieras. Posteriormente, una vez se solucionarán esos asuntos, los equipos serían devueltos a la corporación.

De igual modo, la prueba testifical estableció que dichos traspasos se realizaron en el contexto de las reclamaciones económicas que enfrentaba la corporación con sus acreedores, incluyendo las gestiones judiciales con Oriental Bank. El propio testigo admitió que la medida se adoptó como una estrategia para proteger los bienes corporativos ante la posibilidad de embargos.

A base de esa prueba, el TPI concluyó que el negocio jurídico celebrado entre las partes constituía un contrato simulado cuyo propósito era sustraer bienes del alcance de los acreedores de la corporación. En consecuencia, determinó que dicho negocio estaba fundado en una causa ilícita o torpe. Esa determinación encuentra apoyo suficiente en el expediente.

Como norma general, los tribunales apelativos no debemos intervenir con la apreciación de la prueba realizada por el tribunal de instancia, particularmente cuando esta descansa en la credibilidad de los testigos que declararon ante dicho foro. Regla 42.2 de Procedimiento Civil, *supra*; *Peña Rivera v. Pacheco Caraballo, supra*; *Ortiz Ortiz v. Medtronic, supra*; *Santiago Ortiz v. Real Legacy et al., supra*. En este caso, la determinación sobre el propósito del acuerdo se fundamentó principalmente en la prueba testifical presentada durante el juicio, la cual fue aquilatada por el foro primario.

A la luz de esas determinaciones, resultaba correcta la conclusión del TPI de que el negocio jurídico tenía una causa ilícita o torpe. En tales circunstancias, el ordenamiento dispone que cuando ambas partes participan en la ilicitud del contrato, ninguna de ellas puede reclamar restitución contra la otra. Art. 1258 del Código Civil de 1930, *supra*; *Sánchez Rodríguez v. López Jiménez, supra*.

Por consiguiente, el foro primario actuó correctamente al concluir que la parte apelante estaba impedida de reclamar la restitución de los bienes traspasados como parte de ese acuerdo.

En su cuarto señalamiento de error, la parte apelante sostiene que el TPI erró al desestimar su reclamación respecto a ciertos equipos no inscritos en el DTOP. Argumenta que, según las propias determinaciones de hecho del foro primario, sobre dichos bienes no se realizó negocio jurídico alguno, por lo que procedía ordenar su devolución mediante la acción reivindicatoria. Tampoco le asiste la razón.

Como se indicó, para que prospere una acción reivindicatoria de bienes muebles corresponde al demandante demostrar, entre otros elementos, su derecho de propiedad sobre el bien reclamado, que la acción se dirige contra quien lo posee y que la cosa se identifique de manera clara y específica. *Ramírez Quiñones v. Soto Padilla, supra,* pág. 157; *Pérez Cruz v. Fernández, supra*; *Arce v. Díaz, supra.*

Si bien el TPI determinó que el acuerdo entre las partes se limitó a los equipos inscritos en el DTOP, ello no releva a la parte apelante de cumplir con los requisitos propios de la acción reivindicatoria respecto a los demás bienes. En otras palabras, aun partiendo de que dichos equipos no formaron parte del negocio jurídico invalidado por el foro primario, correspondía a la parte apelante demostrar de forma suficiente su titularidad sobre esos bienes y su adecuada identificación.

Del expediente no surge que la parte apelante haya probado con la claridad requerida su derecho de propiedad sobre los equipos reclamados ni que estos hayan sido identificados con la especificidad necesaria para sostener una acción reivindicatoria.

Ante ello, no encontramos base para intervenir con el resultado alcanzado por el foro primario en cuanto a este extremo. En consecuencia, el cuarto señalamiento de error no se cometió.

**IV.**

Por los fundamentos que anteceden, se ***confirma*** la Sentencia apelada.

Notifíquese.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís<br>
Secretaria del Tribunal de Apelaciones